# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRUINJECT CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-592-LPS-JLH |
| | ) | |
| NESTLÉ SKIN HEALTH, S.A., GALDERMA, | ) | |
| S.A., GALDERMA LABORATORIES, L.P., | ) | |
| NESTLÉ SKIN HEALTH, INC., JOHN | ) | |
| ROGERS, STUART RAETZMAN, SCOTT | ) | |
| MCCREA, ALISA LASK and TIPHANY | ) | |
| LOPEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Truinject Corp. ("Plaintiff" or "Truinject") filed this suit against Nestlé Skin Health, S.A., Galderma, S.A., Galderma Laboratories, L.P. ("Galderma Labs"), Nestlé Skin Health, Inc. (collectively, "Corporate Defendants"), John Rogers, Stuart Raetzman, Scott McCrea, Alisa Lask, and Tiphany Lopez (collectively, "Individual Defendants"), alleging breach of contract, fraud, patent infringement, trade secret misappropriation, and other related claims. (D.I. 112.)

Truinject alleges that it developed a training platform to teach medical professionals the proper technique for facial injections of neurotoxins (*e.g.*, Botox) and dermal fillers (*e.g.*, collagen). The platform includes a lifelike model of a human head, a syringe, and a computer interface that allows the user to see the location of the syringe needle in the model. Truinject is the assignee of multiple patents covering its technology.

Beginning in 2014, Truinject and some of the Corporate Defendants (who are all related) discussed potential business deals relating to Truinject's technology. These discussions continued

for several years, but a deal was never consummated.  Instead, some of the Corporate Defendants developed and launched their own competing injection training platform.  The heart of Truinject's case is its allegation that Defendants misrepresented their interest in a business deal with Truinject in order to induce it to disclose its confidential information and trade secrets, which Defendants then used to develop a competing and infringing product.

Pending before the Court are five separate motions to dismiss.  Nestlé Skin Health, S.A. moved to dismiss all claims against it for lack of personal jurisdiction under Rule 12(b)(2) or, in the alternative, for failure to state a claim under Rule 12(b)(6).  In the remaining four motions, at least one defendant moved to dismiss each of the following counts for failure to state a claim under Rule 12(b)(6): Count I (breach of contract); Count II (breach of the implied covenant of good faith and fair dealing); Count IV (breach of the implied covenant); Count V (breach of contract); Count VI (breach of the implied covenant); Count VII (breach of contract); Count VIII (breach of the implied covenant); Count IX (breach of contract); Count X (breach of the implied covenant); Count XI (tortious interference); Count XVI (trade dress infringement); Count XIX (fraud); Count XX (fraud); Count XXI (fraud); Count XXII (fraud); Count XXIII (aiding and abetting); Count XXIV (fraud); and Count XXV (unfair competition).

This Report and Recommendation resolves Nestlé Skin Health, S.A.'s motion to dismiss. (D.I. 123.)  For the reasons set forth below, I conclude that the Court lacks personal jurisdiction over Nestlé Skin Health, S.A.  I therefore recommend that Nestlé Skin Health, S.A.'s motion be GRANTED.

# I. BACKGROUND[1]

Facial injections of neurotoxins and dermal fillers are becoming increasingly popular and create billions of dollars in revenue. (D.I. 112 ¶ 1.) Unfortunately, complications can occur and may include blindness, vision impairment, stroke, cheek rot, drooping eyelids, and misshapen facial features. (*Id.* ¶¶ 2-4, 48.) Many complications stem from inadequate training of the doctors who perform the injections. (*Id.* ¶ 5.) Before the technology at issue in this case, doctors learned to inject by practicing on either cadavers or live patients. (*Id.* ¶ 73-74.)

The founder of Truinject, Gabrielle Rios, recognized that inadequate training contributed to complications, and she conceived of a solution: "a sophisticated injection training platform, a virtual and augmented reality training system, and an interactive training application on tablets, all of which allow providers to refine their technique by repeatedly performing injections and receiving immediate feedback, all without exposing patients to the complications of bad injections." (*Id.* ¶¶ 6-10, 47-49.) Truinject subsequently developed technology "consist[ing] of an injectable, anatomically correct simulated face model," referred to as "Kate," and a smart syringe that allows medical professionals to practice injections. (*Id.* ¶ 51.) Truinject also developed an accompanying virtual and augmented reality platform and an interactive iPad app

---

[1] For the most part, the facts set forth in this section are taken from the Amended Complaint and are assumed to be true. As explained in more detail below, for purposes of resolving Nestlé Skin Health, S.A.'s motion to dismiss for lack of personal jurisdiction, I am also permitted to look to materials outside the Complaint. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). Whether this Court has personal jurisdiction over Nestlé Skin Health, S.A. in this case depends on its role in the alleged transactions. In general, the Amended Complaint attempts to create the impression that Nestlé Skin Health, S.A.'s role was significant by collectively defining all of the Corporate Defendants as "Nestlé Skin Health" in the Complaint. The complaint also frequently refers to "Defendants" without specifying a particular Defendant. Those tricks make it extremely difficult for me to discern from the Amended Complaint which Defendant performed the alleged acts. It also makes it impossible to discern which Corporate Defendant certain individuals worked for. Where there are discrepancies among the Amended Complaint and the affidavits submitted by the parties that are relevant to the motion to dismiss for lack of personal jurisdiction, I note them.

(collectively, the "Truinject Platform"), which aid in teaching the proper injection technique. (*Id.* ¶¶ 10-11, 51-52, 71.) Truinject holds at least three United States Patents protecting the Truinject Platform: U.S. Patent No. 9,792,836 ("'836 patent"), U.S. Patent No. 10,290,231 ("'231 patent"), and U.S. Patent No. 10,290,232 ("'232 patent"). (*Id.* ¶¶ 53, 57, 60.)

After hearing about the Truinject Platform, several companies, including Defendant Galderma Labs, "approached Truinject to develop a business relationship for the technology and science." (*Id.* ¶ 15.) Galderma Labs is an indirect subsidiary of Defendant Nestlé Skin Health, S.A., a Swiss corporation. (D.I. 112 ¶ 34; D.I. 161.) Galderma, S.A. is a wholly-owned subsidiary of Defendant Nestlé Skin Health, S.A. (D.I. 112 ¶ 31; D.I. 161.) Defendant Nestlé Skin Health, Inc. is a Delaware corporation and is a wholly-owned subsidiary of Nestlé Skin Health, S.A. (D.I. 112 ¶ 33; D.I. 161.)

In early 2014, an executive at Galderma Labs, Elizabeth Bentley, told Rios that Galderma Labs was interested in a potential partnership with Truinject. (*Id.* ¶ 90.) Bentley introduced Rios, via email, to several other employees of Galderma Labs, and they scheduled a phone meeting for September 5, 2014. (*Id.* ¶¶ 91-92.) Several executives participated on behalf of Galderma Labs, including Per Lango and Defendant Alisa Lask. (*Id.* ¶ 92.)

After the phone meeting, Galderma Labs arranged for Truinject to give a presentation on the Truinject Platform at Galderma Labs' headquarters in Texas. (*Id.* ¶ 17.) During the October 21, 2014 presentation, Truinject demonstrated Kate's functionality. (*Id.* ¶ 93.) Numerous employees from Galderma Labs "or affiliate[s]" attended the presentation, including Defendant Dr. John Rogers ("Rogers").[2] (*Id.* ¶¶ 94-95.) Lask asked Truinject to send its presentation slides

---

[2] There is a discrepancy between the Amended Complaint and the evidence submitted by Nestlé Skin Health, S.A. regarding which entity Rogers worked for. Two paragraphs of the Amended Complaint allege that Rogers worked for Nestlé Skin Health, S.A. (*Id.* ¶¶ 95, 96.) And

to Rogers. (*Id.* ¶ 96.) Rogers also sent an email to Rios, stating that his job responsibility at Galderma[3] "will be do [sic] develop and shape the educational platforms for training physicians on injection technique" and that what Truinject was developing was "very much to [his] heart [sic]." (*Id.* ¶ 103.)

After the presentation, Lango expressed interest on behalf of Galderma Labs in buying global rights to Truinject's technology, and he requested a period of exclusivity during the due diligence process. (*Id.* ¶ 97.) The next day, on October 22, 2014, Rios, Lango, and Defendant Scott McCrea, Director of Business Development for Galderma Labs, had a call to further discuss a potential business relationship. (*Id.* ¶ 107.)

Galderma Labs and Truinject subsequently signed a Confidential Disclosure Agreement ("2014 CDA"). (*Id.* ¶ 98, Ex. 4.) The preamble to the CDA states that it was "made this 23rd day of October, 2014 . . ., between **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." The 2014 CDA does not define "Affiliates." (*Id.*, Ex. 4 at 1.) The 2014 CDA contemplates that the

---

another paragraph quotes an email from Rogers as follows: "Rogers emailed Ms. Rios, stating that '[a] major responsibility for me while at Allergan, and now at [Nestlé Skin Health], will be do [sic] develop and shape the educational platforms for training physicians on injection technique.'" (¶ 104.) Since the Amended Complaint broadly defines "Nestlé Skin Health" to mean all of the Corporate Defendants, I asked Truinject's counsel at oral argument what the bracketed language actually said. Counsel responded that the bracketed language, in fact, stated "at Galderma." (Tr. 130:3-131:20.) Although I recognize that Truinject may have had trouble determining which Corporate Defendant certain individuals worked for, in this instance it appears that Truinject has intentionally obfuscated the facts to bolster its argument for personal jurisdiction over Nestlé Skin Health, S.A.

A declaration submitted by Nestlé Skin Health, S.A. avers that it has never employed Rogers. (D.I. 135 ¶ 14.) While Truinject suggested at oral argument that it has evidence that Rogers did work for Nestlé Skin Health, S.A., or that he represented as much to Rios (Tr. 130:3-132:2), none of that evidence is in the record before the Court.

[3] *See* Note 2, *supra*.

parties would exchange confidential information in connection with a "possible business or collaborative opportunity with regard to Truinject's proprietary technology." (*Id.*) Under Paragraph 2.0, the parties agree "to hold in confidence and not publish or disclose the other's Confidential Information." (*Id.*) Pursuant to Paragraph 9.2, the parties agree that the state and federal courts in Delaware will have exclusive jurisdiction to resolve any claims arising out of the 2014 CDA. (*Id.*, Ex. 4 at 2.)

Rios signed the 2014 CDA on behalf of "TruInject Medical Corp." on October 27, 2014. (*Id.*, Ex. 4 at 3.) Quintin Cassady, Vice President of Galderma Labs, signed on behalf of "Galderma Laboratories, L.P." on October 29, 2014. (*Id.*) The 2014 CDA contains no signature block (or signature) for any "affiliates" of Galderma Labs. (*Id.*) Relying on the 2014 CDA, Truinject "provided [] Defendants with access to trade secrets and confidential information, including the names of vendors and information about Kate." (*Id.* ¶ 102.)

On October 28, 2014, McCrea told Rios that a partnership with Truinject would result in a global deal that would benefit both companies. (*Id.* ¶ 108.) McCrea also discussed entering into an exclusivity arrangement with Truinject during the due diligence process. (*Id.* ¶¶ 108-109.) He asked Rios to cancel all pending meetings that Truinject had scheduled with other interested potential partners. (*Id.*) Truinject refused to cancel previously scheduled meetings. (*Id.* ¶ 110.)

McCrea called Rios again on November 5, 2014 and emphasized the need for an exclusivity agreement. (*Id.* ¶ 111.) He also discouraged Rios from working with "Defendants'"[4] competitors,

---

[4] Paragraphs 108-112 of the Amended Complaint refer to numerous statements by McCrea about "Defendants" and/or "Nestlé Skin Health" (defined broadly to include all Corporate Defendants). The way the complaint is drafted, I cannot tell if McCrea actually used the words "Nestlé Skin Health" or if this is an attempt on the part of Truinject to muddy the facts. Regardless, Defendants' uncontroverted declaration states that McCrea did not work for Nestlé Skin Health, S.A.

who, according to McCrea, would steal Truinject's technology. (*Id.* ¶ 111.) During the call, McCrea promised that his company would not steal the technology and that they were serious about a deal. (*Id.*) Relying on McCrea's representations, Truinject canceled its scheduled meetings with Defendants' competitors. (*Id.* ¶ 112.)

On November 6, 2014, during an industry conference in San Diego, Truinject and several of the Corporate Defendants' employees had a private meeting. (*Id.* ¶ 113.) In attendance was Nestlé Skin Health, Inc.'s CEO, Didier Leclerqc. During the meeting, Truinject gave a live demonstration of Kate and allowed the attendees to simulate injections. (*Id.*) Leclerqc also took the syringe apart and examined it. (*Id.* ¶ 114.)

On November 10, 2014, Galderma, S.A. and Truinject signed an Exclusive Negotiation Agreement ("2014 ENA"), with an effective date of November 5, 2014. (*Id.* ¶ 116.) The 2014 ENA gave Galderma S.A. a ninety-day exclusive right to evaluate the technology and negotiate a deal with Truinject. (*Id.* ¶ 117, Ex. 5.) Rios signed the 2014 ENA on behalf of "TRUINJECT MEDICAL CORP." (*Id.*, Ex. 5 at 3.) Christian Matton, Vice-President and Corporate General Counsel, signed on behalf of "GALDERMA S.A." (*Id.*)

Another meeting was scheduled for December 16, 2014. (*Id.* ¶ 133.) McCrea told Rios that the meeting "would allow Galderma to take a huge step forward towards being able to present plans about Galderma's proposed uses for the Truinject Platform." (*Id.* ¶ 138.) In reliance on McCrea's expression of continued interest, Truinject gave another full presentation and demonstration of the Truinject Platform at the December 16 meeting. (*Id.* ¶ 140.) Following the presentation, Galderma Labs told Truinject that it was interested in acquiring exclusive global rights to the Truinject technology for a term of 100 years in exchange for a $50 million upfront payment and lifetime royalties. (*Id.*) Lango told Rios that "partnering with 'Uncle Nestlé' would

'catapult her' and Truinject into the global market." (*Id.* ¶ 140.) McCrea and Brant Schofield, Vice President of New Business at Galderma S.A., told Rios that "her children and her children's children would be taken care of for life." (*Id.* ¶ 141.) Rios subsequently received an email from a Galderma Labs' Vice President in which he expressed his appreciation and stated that they would move forward with the deal process discussed at the meeting. (*Id.* ¶ 143.)

On December 21, 2014, McCrea called Rios to discuss including Truinject in a January 10, 2015 meeting with Galderma's Key Opinion Leader Advisory Board. (*Id.* ¶ 147.) McCrea told Rios that this would be the "final due diligence meeting between Galderma and Truinject." (*Id.*) In a December 22, 2014 email, McCrea outlined the agenda for the meeting. (*Id.* ¶ 149.) Truinject believed that the proposed agenda "went beyond the due diligence and collaborative effort" promised by McCrea, and Truinject responded with its own terms. (*Id.* ¶¶ 150-151.) When Galderma Labs and McCrea refused to modify the proposed agenda, Truinject declined to move forward with the January 10 meeting. (*Id.* ¶¶ 154-156.)

After that, deal discussions broke down and the parties had limited interactions until 2016. (*Id.* ¶¶ 163-169.) In the meantime, according to the Amended Complaint, Defendants began developing a similar technology to compete with Truinject's Platform. (*Id.* ¶ 168.)

In early 2016, Galderma, S.A.'s CEO, Defendant Stuart Raetzman, "contacted Truinject expressing a renewed interest in Truinject's technology." (*Id.* ¶ 173.) Galderma Labs and Truinject subsequently signed another Confidential Disclosure Agreement ("2016 CDA"). (*Id.* ¶ 175, Ex. 6.) The preamble to the CDA states that it was "made this 18th day of February, 2016 . . ., between **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." (*Id.*, Ex. 6 at 1.) Like the 2014 CDA, the 2016 CDA does not define "Affiliates." The 2016 CDA also provides that state

and federal Courts in Delaware will have exclusive jurisdiction to resolve disputes arising out of the agreement. Rios signed the 2016 CDA on behalf of "TruInject Medical Corp." on February 18, 2016. (*Id.*, Ex. 6 at 3.) Quintin Cassady, Vice President of Galderma Labs, signed on behalf of "Galderma Laboratories, L.P." on February 23, 2016. (*Id.*) The 2016 CDA contains no signature block (or signature) for any "affiliates" of Galderma Labs. (*Id.*)

After the CDA was executed, Galderma S.A.'s Raetzman scheduled a meeting for February 19, 2016 to discuss a potential deal. (*Id.* ¶ 180.) In attendance were Rios, another representative from Truinject, Raetzman, Galderma Labs' McCrea, and Pierre Streit, CFO of Nestlé Skin Health, S.A. (*Id.* ¶ 181.) Truinject gave a presentation and a demonstration of Kate. (*Id.* ¶ 180.) The attendees also discussed "the value drivers and benefits" of a partnership and business and marketing plans. (*Id.*)

Truinject met with Raetzman, McCrea, and Streit again on March 5, 2016. (*Id.* ¶ 182.) Raetzman expressed interest in a global license of Truinject's technology. (*Id.*) Raetzman also stated that Defendant Rogers' review of the technology would be the "final step" in the due diligence process. (*Id.* ¶ 183.)

On March 7, 2016, Peter Nicholson, who had not attended the March 5 meeting, emailed Truinject a summary of the meeting. (*Id.* ¶ 190.) Nicholson's signature block identified him as "Vice President of Business Development & Strategy" and it contained the name and address of Nestlé Skin Health, S.A.[5] (*Id.*; D.I. 153 ¶ 15.)

There was another call on April 18, 2016. (*Id.* ¶ 191.) Rogers was present on the call. (*Id.*) During the call, Galderma "advised Truinject that their due diligence would need to include

---

[5] Nestlé Skin Health, S.A. submitted a declaration that states that Nicholson was employed by Nestlé Skin Health, S.A. from January 1, 2017 to August 31, 2017, but was not employed by it in 2016. (D.I. 135 ¶ 16.)

a firsthand interactive demonstration of Kate and that Rogers would need to attend and inject on Kate." (*Id.*) Between May and December 2016, Rogers and others asked Truinject for updates related to its development of the technology. (*Id.* ¶¶ 194-199.)

During the same time period, two Galderma Labs drug sales representatives, Defendant Tiphany Lopez and Chad Tisckos,[6] contacted Truinject in relation to the SHIELD program, which allowed the top sales associates to pitch potential business or investment opportunities. (*Id.* ¶ 200.) Truinject provided them with confidential information about Kate and the Truinject Platform. (*Id.* ¶¶ 202-203.) Tisckos signed a Confidential Disclosure Agreement at Truinject's offices that required him, Lopez, and at least one of the Corporate Defendants (the Amended Complaint doesn't specify which) to use Truinject's confidential information "only for the Purpose of the Agreement" and to "hold the disclosure of Confidential Information in confidence." (*Id.* ¶ 204.) Lopez subsequently pitched Truinject to the SHIELD program. (*Id.* ¶ 242.)

On February 7, 2017, Rogers visited the Truinject facilities to conduct a comprehensive review of the Truinject Platform, the "final" step in the due diligence process. (*Id.* ¶ 208.) Rios told Rogers that he must sign a non-disclosure agreement "due to possible exposure to confidential information, technology currently being developed, and Truinject's trade secrets." (*Id.* ¶ 209.) Rogers called counsel for advice and then signed the agreement ("2017 CDA"). (*Id.* ¶¶ 211-13.) The preamble to the 2017 CDA states that the parties to the agreement are "Galderma and Truinject Medical Corp." (*Id.*, Ex. 7.) "Galderma" is not defined. The 2017 CDA provides that it "shall be governed by the laws of the State of California." (*Id.*)

---

[6] Paragraph 30 of the Amended Complaint alleges that Lopez worked for Defendant Galderma Labs "at all relevant times." The Amended Complaint does not indicate which entity Tisckos worked for. Defendants' uncontroverted declaration states that Lopez and Tisckos have never worked for Nestlé Skin Health, S.A. (D.I. 135 ¶ 14.)

After signing the 2017 CDA, Rogers spent an hour and a half testing the Truinject Platform. (*Id.* ¶¶ 215-219.) After his visit, communications from Defendants to Truinject ceased. (*Id.* ¶¶ 220-223.) Despite Truinject's efforts to reach out and move forward with a potential deal, Truinject heard nothing further from Defendants. (*Id.*)

In Spring 2018, over a year after Rogers' visit, Truinject learned that Nestlé Skin Health, Inc. had introduced its own injection training simulator platform, named "Holly." (*Id.* ¶¶ 226-227.) Nestlé Skin Health, Inc. conducted public demonstrations of Holly as early as March 2018 and subsequently demonstrated it worldwide. (*Id.* ¶¶ 236, 240.) On April 30, 2018, Nestlé Skin Health, Inc. debuted its LucyLive program, an augmented and virtual reality program that accompanied Holly. (*Id.* ¶ 244.) Following the Holly and LucyLive launches, physicians, industry executives, and other providers called and emailed Rios to congratulate her, mistakenly believing that Holly/LucyLive was Truinject's Kate platform. (*Id.* ¶ 246.)

Truinject filed its original Complaint in the Central District of California on October 12, 2018. (D.I. 1.) On December 14, 2018, Galderma Labs moved to dismiss for lack of venue and failure to state a claim (D.I. 34) and, on December 18, 2018, moved to transfer the case to the District of Delaware (D.I. 39). Individual Defendants Lopez, McCrea, and Lask all filed motions to dismiss for lack of personal jurisdiction and failure to state a claim. (D.I. 54; D.I. 57; D.I. 59.) They also joined Galderma Labs' motion to transfer. (D.I. 73.) On March 11, 2019, Defendants Galderma, S.A., Nestlé Skin Health, S.A., and Stuart Raetzman moved to dismiss Truinject's Complaint for lack of personal jurisdiction and failure to state a claim. (D.I. 92; D.I. 93.) Galderma, S.A., Nestlé Skin Health, S.A., and Raetzman did not join the motion to transfer to Delaware.

On March 28, 2019, the district court in the Central District of California granted Galderma Labs' motion to transfer and transferred the action in its entirety to the District of Delaware. (D.I. 101.) The court specifically declined to address the remaining motions, stating, "Because the Court finds transfer appropriate, it declines to address the other pending motions in this matter. . . . To the extent those motions are not mooted by transfer, the questions presented therein are reserved for the transferee court." (*Id.* at 1.) The court further noted that many of the defendants had consented to be sued in Delaware, but it did not address Nestlé Skin Health, S.A.'s motion to dismiss for lack of personal jurisdiction. Nor did the court address whether the District of Delaware had personal jurisdiction over Nestlé Skin Health, S.A. Instead, it stated as follows:

> Galderma Labs, Lask, Lopez, and McCrea have consented to be sued in Delaware by invoking the forum-selection clauses and seeking transfer there. Similarly, insofar as any other Defendant is bound by the agreements containing the forum-selection clauses that underly Plaintiff's claims, such Defendant has effectively consented to resolution of the dispute in Delaware.

(*Id.* at 12.)

On May 29, 2019, Truinject filed an Amended Complaint in this Court. The Amended Complaint contains twenty-five counts:

- Count I – breach of contract (2017 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count II – breach of the implied covenant of good faith and fair dealing (the "implied covenant") (2017 CDA) against Galderma Labs and Galderma, S.A.;

- Count III – breach of contract (2014 ENA) against Galderma, S.A.;

- Count IV – breach of the implied covenant (2014 ENA) against Galderma Labs and Galderma, S.A.;

- Count V – breach of contract (2014 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VI – breach of the implied covenant (2014 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VII – breach of contract (2016 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VIII – breach of the implied covenant (2016 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count IX – breach of contract (2017 CDA) against Defendant Rogers;

- Count X – breach of the implied covenant (2017 CDA) against Defendant Rogers;

- Count XI – tortious interference with contractual and prospective contractual relations against Galderma Labs and Galderma, S.A.;

- Count XII – patent infringement ('836 patent) against Nestlé Skin Health, Inc.;

- Count XIII – patent infringement ('231 patent) against Nestlé Skin Health, Inc.;

- Count XIV – patent infringement ('232 patent) against Nestlé Skin Health, Inc.;

- Count XV – trade secret misappropriation under the Defend Trade Secret Act (18 U.S.C. § 1836) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XVI – trade dress infringement (15 U.S.C. § 1125) against Nestlé Skin Health, Inc.;

- Count XVII – violation of Delaware Uniform Trade Secret Act (6 Del. C. §§ 2001-2009) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XVIII – violation of Delaware's Deceptive Trade Practice Act (6 Del. C. §§ 2531 *et seq.*) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XIX – fraud against Defendant Rogers;

- Count XX – fraud against Defendant Raetzman;

- Count XXI – fraud against Defendant Lopez;

- Count XXII – fraud against Defendant McCrea;

- Count XXIII – aiding and abetting fraud against Defendant Lask;

- Count XXIV – fraud against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.; and

- Count XXV – unfair competition under California Business and Professional Code § 17200 against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.

The Amended Complaint seeks damages and injunctive relief. (*Id.*)

Defendants filed the pending motions to dismiss in July 2019 (D.I. 117, 119, 121, 123, 125), and the parties completed the briefing on October 25, 2019. Truinject requested oral argument (D.I. 147), and I heard oral argument on November 1, 2019. ("Tr. __".)

## II. LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Although Rule 8 does not require a plaintiff to set forth in the complaint "the grounds upon which the court has personal jurisdiction over the defendant," *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 474 (D. Del. 1995), "once a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). But if the district court does not hold an evidentiary hearing, the court should resolve any factual disputes in the plaintiff's favor and should deny the motion if the plaintiff's evidence establishes "a prima facie case of personal jurisdiction." *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010).

## III.    DISCUSSION

Defendant Nestlé Skin Health, S.A. argues that the Court lacks personal jurisdiction over it.  I agree.

To exercise personal jurisdiction over a defendant, a court generally must answer two questions: one statutory and one constitutional.  *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998); *Acorda Therapeutics, Inc. v. Mylan Pharm. Inc.*, 78 F. Supp. 3d 572, 580 (D. Del. 2015), *aff'd,* 817 F.3d 755 (Fed. Cir. 2016).  The statutory inquiry requires the court to determine whether jurisdiction over the defendant is appropriate under the long-arm statute of the state in which the court is located.  *IMO Indus.*, 155 F.3d at 259.

The constitutional inquiry asks whether exercising jurisdiction over the defendant comports with the Due Process Clause of the U.S. Constitution.  *Id.*  Due Process is satisfied where the court finds the existence of "certain minimum contacts" between the defendant and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  A defendant's "contacts" with the forum state can give rise to "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction."  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017); *see also Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).  A court has general jurisdiction over a corporate defendant when its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Provident Nat. Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987).  If the court has general jurisdiction over a corporate defendant, it may hear any claim against it, even if the claim arose

outside the state. *Goodyear*, 564 U.S. at 919; *Provident Nat. Bank*, 819 F.2d at 437. A court has specific jurisdiction over a defendant in a particular suit "when the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum." *Goodyear*, 564 U.S. at 923-24 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n. 8, (1984)); *see also Remick*, 238 F.3d at 255.

But the requirement that a court have personal jurisdiction is a "waivable right," and a defendant may consent to the jurisdiction of the court. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *see also Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."). A defendant is deemed to have consented to personal jurisdiction in a particular jurisdiction when the parties have stipulated in advance that their controversies should be resolved in that jurisdiction, such as in a forum selection clause of a contract. *See Burger King*, 471 U.S. at 472 n.14 (1985); *see also Hardwire, LLC v. Zero Int'l*, Inc., No. CV 14-54-LPS-CJB, 2014 WL 5144610, *6 (D. Del. Oct. 14, 2014); *Eastman Chem. Co. v. AlphaPet Inc.*, No. Civ. A. 09-971-LPS, 2011 WL 6004079, at *4 (D. Del. Nov. 4, 2011) (quoting *Hadley v. Shaffer*, No. Civ. A. 99-144-JJF, 2003 WL 21960406 (D. Del. Aug. 12, 2003)); *Neurvana Med., LLC v. Balt USA, LLC*, No. CV 2019-0034-KSJM, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019), *reargument denied,* No. CV 2019-0034-KSJM, 2019 WL 5092894 (Del. Ch. Oct. 10, 2019). If a defendant has agreed to a forum selection clause, there is no requirement for the court to undertake a separate due process "minimum contacts" analysis. *Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008); *see also Burger King*, 471 U.S. at 472 n.14 (enforcement of "freely negotiated" forum selection clauses does not offend due process).

In this case, Truinject does not contend that Nestlé Skin Health, S.A., a Swiss Corporation, is subject to general jurisdiction in Delaware. Nor does Truinject contend that Nestlé Skin Health, S.A. had any contacts with Delaware that would support the exercise of specific jurisdiction. Instead, Truinject argues that the Court should deem Nestlé Skin Health, S.A. to have consented to jurisdiction in Delaware as a result of the 2014 and 2016 CDAs, both of which contain Delaware forum selection clauses. The fundamental problem with Truinject's argument, as explained below, is that Nestlé Skin Health, S.A. is not bound by either of those agreements. Accordingly, I recommend that it be dismissed.

**A. Nestlé Skin Health, S.A. is not a party to the 2014 or 2016 CDAs because Galderma Labs (or its agent Cassady) did not have authority to sign on Nestlé Skin Health, S.A.'s behalf.**

Truinject's primary argument is that Nestlé Skin Health, S.A. is a party to the 2014 and 2016 CDAs. The preamble to each CDA states that it is "made . . . between . . . **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." (D.I. 112, Exs. 4, 6.) Truinject argues that Nestlé Skin Health, S.A. is an "affiliate" of Galderma Laboratories. L.P. and is therefore a party to, and thus bound by, the agreements. (D.I. 152; Tr. 25:15-26:14.)

Even assuming that Truinject is right about the scope of the term "affiliates," that would not end the analysis. Under Delaware law, usually only a party that has signed an agreement is bound by it. *Eastman Chem.*, 2011 WL 6004079, at *4; *McWane, Inc. v. Lanier*, No. CV 9488-VCP, 2015 WL 399582, at *7 (Del. Ch. Jan. 20, 2015); *Neurvana*, 2019 WL 4464268, at *6. Here, Nestlé Skin Health, S.A. is not a signatory. The 2014 and 2016 CDAs were signed by Quintin Cassady on behalf of "Galderma Laboratories, L.P.," and there is no signature block or signature for any "affiliates." (D.I. 112, Exs. 4, 6.) Moreover, a corporate parent is not bound by contracts entered into by its subsidiary merely because the parent owns the subsidiary. *Vichi v. Koninklijke*

*Philips Elecs. N.V.*, 62 A.3d 26, 48-49 (Del. Ch. 2012); *E.I. DuPont de Nemours and Co. v. Rhodia Fiber and Resin Intermediates, S.A.S.*, 197 F.R.D. 112, 127 (D. Del. 2000).

As I see it—again, assuming for the sake of argument that the CDAs' reference to "affiliates" covers Nestlé Skin Health, S.A.—the only way it could be a *party* to the CDAs is if the entity who did sign them had actual or apparent authority to bind Nestlé Skin Health, S.A. There are no allegations in the Amended Complaint supporting a conclusion that Galderma Labs (a Texas partnership) had actual authority to bind Nestlé Skin Health, S.A. (an indirect parent and a Swiss Corporation), nor has Truinject provided any evidence. On the other hand, Nestlé Skin Health, S.A. has submitted uncontroverted declarations stating that Cassady was not employed by Nestlé Skin Health, S.A. and that Cassady and Galderma Labs had no authority to sign on Nestlé Skin Health, S.A.'s behalf. (D.I. 135 ¶ 13; D.I. 150, Ex. 1 ¶ 5.)

There are also no allegations or evidence suggesting that Cassady or Galderma Labs had apparent authority to bind Nestlé Skin Health, S.A. to the CDAs. "[I]t is well settled that apparent authority (1) results from a manifestation by a person that another is his agent and (2) exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." *Pell v. E.I. DuPont De Nemours & Co.*, 231 F.R.D. 186, 190 (D. Del. 2005) (internal marks omitted); *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 801–802 (Del. Ch. 2014) ("[A]pparent agency . . . requires that a person's belief in the agency relationship be 'traceable to the principal's manifestations.'" (quoting Restatement (Third) of Agency § 2.03 (2006))).

In this case, the Amended Complaint does not allege any manifestations by Nestlé Skin Health, S.A. that Galderma Labs had the authority to bind it to the 2014 and 2016 CDAs. Nor has Truinject submitted any evidence that *prima facie* supports that conclusion. In opposing the

motion to dismiss, Truinject submitted a declaration from Rios stating her belief that Nestlé Skin Health, S.A. would be bound by the CDAs. (D.I. 153 at 2-3.) In this procedural posture, I take her declaration as true. Missing from the declaration, however, are facts evidencing a manifestation *by Nestlé Skin Health, S.A.* that could have reasonably given rise to that belief. Indeed, the record contains no suggestion that Nestlé Skin Health, S.A. was even aware of the existence of the CDAs around the time of their execution.[7]

The only Nestlé Skin Health, S.A. employee (during the relevant time) that is even mentioned in the Amended Complaint is Peirre Streit, its Chief Financial Officer. The Amended Complaint's sole allegations with respect to Streit are that he attended two meetings in February and March 2016 in which a potential business deal between Truinject and Galderma Labs was discussed. But there is no allegation that Streit said or did anything to suggest to Truinject that Galderma Labs was acting as Nestlé Skin Health, S.A.'s agent with respect to the CDAs or the proposed deal. Nor has Truinject submitted any evidence supporting that conclusion. Under these

---

[7] At oral argument, counsel for Truinject referred to emails it received from Peter Nicholson in 2016 in which his signature block contained the name and address of Nestlé Skin Health, S.A. (Tr. 28:15-30:11.) According to Rios's declaration, she believed that Nestlé Skin Health, S.A. would be bound by the 2016 CDA because Nicholson used that signature block in an email forwarding an executed copy of the 2016 CDA and in an email discussing the March 4, 2016 meeting between Truinject and Galderma Labs. (D.I. 153 ¶¶ 10, 15.) That is not enough to support a finding of apparent authority. Apparent authority requires a manifestation *by Nestlé Skin Health, S.A.* that Galderma Labs had the authority to bind it to the CDA. Here, the record contains an uncontroverted declaration that Nicholson did not work for Nestlé Skin Health, S.A. In addition, the record contains no allegations or evidence that Nicholson made any manifestations regarding Galderma Labs' authority to bind Nestlé Skin Health, S.A. Under these circumstances, the fact that Nestlé Skin Health, S.A. might have permitted Nicholson to use its name in his signature block (which I assume true for purposes of the argument) is insufficient to support a finding of apparent authority. *Cf. Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 802 (Del. Ch. 2014) ("While it may have been careless for Philips N.V. to permit employees of its subsidiaries to use, for example, generic Philips email addresses and send correspondence bearing the Philips N.V. logo, that does not, in this instance, amount to a manifestation that such employees 'ha[d] authority to act with legal consequences' on Philips N.V.'s behalf.").

circumstances, there is no basis for a finding that Galderma Labs had apparent authority to bind Nestlé Skin Health, S.A. to the CDAs.[8]

Absent any manifestations from Nestlé Skin Health, S.A. that Galderma Labs had authority to bind it to the 2014 and 2016 CDAs, there cannot be apparent authority. Nestlé Skin Health, S.A. was not a party to the 2014 and 2016 CDAs.

**B. The Court does not have personal jurisdiction over Nestlé Skin Health, S.A. under the "closely related" test.**

Even though Nestlé Skin Health, S.A. is not a party to the CDAs, Truinject argues that the forum selection clause in the CDAs should still bind Nestlé Skin Health, S.A. For that argument, Truinject cites cases that perform a three-step analysis to determine whether a non-party to an agreement should nonetheless be bound by its forum selection clause: "(1) is the forum selection clause valid, (2) is the non-signatory a third-party beneficiary of the agreement or closely related to the agreement, and (3) does the claim at hand arise from the non-signatory's status related to the agreement?" *Carlyle Inv. Mgmt LLC v. Moonmouth Co. SA*, 779 F.3d 214, 218 (3d Cir. 2015); *see also Hadley*, 2003 WL 21960406, *4.

The parties here focus on question (2). Truinject has made no real argument that Nestlé Skin Health, S.A. is a "third-party beneficiary" of the 2014 and 2016 CDAs and there is nothing before me to support such a conclusion. *See Eastman Chem.*, 2011 WL 6004079, at *6-9 (affiliate corporation not a third-party beneficiary when it wasn't explicitly mentioned in the contract and there was no other evidence that the parties intended to directly benefit the affiliate). Truinject

---

[8] A non-signatory can also become a party to an agreement under a ratification theory, but Truinject did not argue ratification in its briefs. Truinject's counsel mentioned ratification for the first time at oral argument but was unable to articulate the elements of ratification, much less convince the Court that each element was satisfied here. (Tr. 148:7-149:23.)

does, however, argue that Nestlé Skin Health, S.A. is "closely related" to the 2014 and 2016 CDAs and should therefore be bound by the forum selection clause.

As an initial matter, I have serious questions about the constitutionality of using the "closely related" test to exercise personal jurisdiction over a non-signatory to a contract with a forum selection clause. As explained above, the exercise of jurisdiction over a party bound by a forum selection clause is based on consent. If the party has consented to a particular forum in a "freely negotiated" agreement, the party is deemed to have waived their right to challenge personal jurisdiction and no further due process "minimum contacts" analysis is required. *Burger King*, 471 U.S. at 472 n.14. But the rationale underlying that rule is absent in cases in which the defendant is not even a party to the agreement. Under those circumstances, a court should not exercise jurisdiction unless the record otherwise demonstrates "minimum contacts" between the defendant and the forum. *See, e.g., Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 394-95 (S.D.N.Y. 2019) (conducting a minimum contacts analysis because "constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants"); *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 926 (N.D. Ill. 2017) (dismissing defendant for lack of personal jurisdiction where defendant lacked minimum contacts with the forum, notwithstanding plaintiff's argument that the defendant was closely related to a contract containing a forum selection clause); *Central Transp. Servs., Inc. v. Cole*, No. 13-1295, 2013 WL 6008303, at *5 (D. Kan. Nov., 13, 2013) (concluding that even if a "non-signatory can sometimes be bound by a forum selection clause that it did not agree to," in the present case, it would nevertheless "violate due process to exercise personal jurisdiction" over the non-signatory based solely upon the forum selection clause); *cf. Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1348 (S.D. Fla. 2001) (holding that a court must consider whether binding a non-signatory

to a forum selection clause "offends due process").  *But see Synthes, Inc. v. Emerge Med., Inc.*, 887 F. Supp. 2d 598 (E.D. Pa. 2012).  Exercising personal jurisdiction solely on the basis that a non-signatory is "closely related" to a contract with a forum selection clause—absent facts establishing "minimum contacts" with the forum—would not, in my view, satisfy constitutional due process.

Regardless, the "closely related" test is not satisfied here.[9]  "The closely related parties doctrine is a form of equitable estoppel."  *See In re McGraw-Hill Global Education Holdings LLC*, 909 F.3d 48, 62-63 (3d Cir. 2018).  The point of the doctrine is to "prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract . . . that it finds distasteful."  *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001).  A non-signatory defendant is considered to be "closely related" to an agreement only if one of two inquiries is satisfied: (1) the non-signatory received a "direct benefit" from the agreement; or (2) it was "foreseeable" that the non-signatory would be bound by the agreement.  *Eastman Chem.*, 2011 WL 6004079, *9; *Neurvana*, 2019 WL 4464268, at *4.  The direct benefit can be either pecuniary or non-pecuniary.  *Neurvana*, 2019 WL 4464268, at *4.  But an indirect benefit is not enough.  *Phunware, Inc. v. Excelmind Grp. Ltd*, 117 F. Supp. 3d 613, 630 (D. Del. 2015); *Neurvana*, 2019 WL 4464268, at *4.

In this case, Truinject has not pointed to any direct benefit that Nestlé Skin Health, S.A. received from the 2014 and 2016 CDAs.  Truinject argues that Nestlé Skin Health, S.A. received a "benefit" under the CDAs because its CFO, Pierre Streit, attended meetings in 2016 in which

---

[9] The parties do not address whether state or federal law applies to the court's application of the "closely related" test.  Nestlé Skin Health, S.A. principally relies on Delaware state cases, and Truinject cites both state and federal cases.  Neither party has pointed to a difference between federal and state law that would affect the outcome here.

Truinject disclosed confidential information in the context of discussing a potential business deal between Truinject and Galderma Labs. (D.I. 112 ¶¶ 180-86; D.I. 132 at 6; Tr. 30:12-23, 38:21-39:6, 45:16-17.) But even assuming that the disclosure of information pursuant to a CDA could be considered a benefit from the agreement (a dubious proposition),[10] the benefit would be only indirect. There is no allegation that Nestlé Skin Health, S.A. ever discussed entering into a business relationship with Truinject at the 2016 meetings or otherwise; the parties were discussing a potential business deal between Truinject and Galderma Labs. Any benefit Nestlé Skin Health, S.A. gained by having its CFO review confidential information relating to a business transaction for one of its subsidiaries is, at best, indirect.[11] *See Phunware*, 117 F. Supp. 3d at 629-30 (holding that non-signatory parent company was not bound by forum selection clause pursuant to closely related test when it only received "indirect" benefits through its status as a shareholder); *Eastman Chem.*, 2011 WL 6004079, at *10 (benefit received by non-signatory corporate parent was at most indirect because it was nothing more than the general benefit that a parent corporation might receive from any transaction involving its subsidiary); *Neurvana*, 2019 WL 4464268, at *11.

---

[10] The disclosure of confidential information pursuant to a CDA is unlike the kinds of benefits that Delaware courts have found sufficient to bind a non-signatory to a forum selection clause. *See, e.g., Neurvana*, 2019 WL 4464268, at *4-7 (collecting cases). The CDAs themselves do not obligate the exchange of information or provide access to confidential information. Rather, the CDAs merely set forth confidentiality obligations to the extent the parties did exchange confidential information in connection with their business negotiations. (*See* D.I. 112, Exs 4, 6.) The "benefit" of such an agreement is the promise of confidentiality, not the information itself.

[11] At oral argument, counsel for Truinject suggested that an indirect benefit "is enough" to satisfy the "closely related" test. (Tr. 37:20-38:4.) That is wrong. The law is clear that the benefit must be direct. *See Neurvana*, 2019 WL 4464268, at *4 ("By contrast, indirect benefits have been deemed insufficient to satisfy the test.").
The only case cited by Truinject in support of its position that the disclosure of confidential information subject to a CDA is a "direct benefit" is *All Energy Corp. v. Energetix, LLC,* 985 F. Supp. 2d 974, 987-91 (S.D. Iowa 2012). That case is not binding on this Court and it is distinguishable. In *All Energy*, the court had already concluded that the corporate defendant was *a party* to a non-disclosure agreement with a forum selection clause before assessing, in *dicta*, whether it also directly benefitted under that agreement. *Id.*

Notwithstanding the lack of a direct benefit to Nestlé Skin Health, S.A. under the CDAs, Truinject argues that it was "foreseeable" that Nestlé Skin Health, S.A. would be bound by the CDAs. Although older state and federal cases suggested that a non-signatory might be bound by a forum selection clause if either the "direct benefit" or the "foreseeability" inquiries were satisfied, more recent cases clarify that courts will generally not bind a non-signatory defendant to a forum selection clause based solely on a theory of foreseeability. Recently, the Third Circuit held that "[f]oreseeability is a prerequisite to applying the closely related parties doctrine" rather than a separate test that can individually satisfy the closely related doctrine. *See McGraw-Hill*, 909 F.3d at 64. And Delaware state courts have cautioned against applying the foreseeability inquiry as a standalone basis for satisfying the closely related test except in two scenarios: (1) where a non-signatory defendant seeks to enforce a forum selection clause against a signatory plaintiff and (2) where a controlling company that is a signatory seeks to use controlled non-signatories to manipulate an "end-run" around the forum selection provision. *See Neurvana*, 2019 WL 4464268, at *5-6. Neither of those scenarios are present here. Accordingly, even if it were foreseeable that Nestlé Skin Health, S.A. would be bound by forum selection clauses in the CDAs (which I do not need to decide), the Court could not assume jurisdiction over Nestlé Skin Health, S.A. based on foreseeability alone.

In sum, I find that Truinject has failed to establish (with allegations or evidence) that Nestlé Skin Health, S.A. was "closely related" to the 2014 or 2016 CDAs so as to be bound by their forum selection clauses.

## C. The transferor court did not hold that Nestlé Skin Health, S.A. is subject to personal jurisdiction in Delaware.

Truinject's final argument is that the district court in the Central District of California already concluded that Nestlé Skin Health, S.A. is subject to personal jurisdiction in Delaware.

That argument is a non-starter. The Central District of California court expressly "decline[d] to address" Nestlé Skin Health, S.A.'s prior motion to dismiss for lack of personal jurisdiction (D.I. 92), which it "reserved for the transferee court." (D.I. 101 at 1.) Although the transferor court recognized that any defendant bound by the forum selection clauses in the CDAs would be subject to jurisdiction in Delaware, it did not make a finding as to which defendants were bound. (*Id.* at 12 ("[I]nsofar as any other Defendant is bound by the agreements containing the forum-selection clauses that underly Plaintiff's claims, such Defendant has effectively consented to resolution of the dispute in Delaware."); *id.* at 13 n.6 (declining to find that any of the defendants were "affiliates" within the meaning of the 2014 and 2016 CDAs because "[at] this juncture, . . . the exact nature of the relationship between the Defendants is not critical to the Court's determination" to transfer the case).).

### D. Jurisdictional discovery is inappropriate.

Truinject also requests jurisdictional discovery. Although there is a presumption in favor of jurisdictional discovery, it should not be ordered as a matter of course. *See E.I. DuPont de Nemours & Co. v. Heraeus Holding GmbH*, No. Civ. A. 11-773-SLR, 2012 WL 4511258, at *11 (D. Del. Sept. 28, 2012). Jurisdictional discovery is only appropriate when the plaintiff presents "factual allegations that suggest with reasonable particularity the possible existence" of facts supporting a finding of personal jurisdiction. *Eurofins Pharma*, 623 F.3d at 157 (internal marks omitted).

In this case, Truinject has not put forth a theory of personal jurisdiction over Nestlé Skin Health, S.A. that would be aided by jurisdictional discovery. Truinject's sole arguments for personal jurisdiction relate to the forum selection clauses in the 2014 and 2016 CDAs. However, as set forth above, there are only two possible bases to enforce those agreements against Nestlé

Skin Health, S.A.: (1) if it is a party to the agreements because Galderma Labs had authority to sign on Nestlé Skin Health, S.A.'s behalf; or (2) if Nestlé Skin Health, S.A. is "closely related" to those agreements because it received a "direct benefit" from them.

Truinject has not explained how additional discovery would help it with either theory, and I do not think it could. As to (1), a finding of apparent authority requires a manifestation on the part of Nestlé Skin Health, S.A. to Truinject. If such manifestations occurred, Truinject would already know about them. Yet Truinject has failed to point to any allegations or evidence of such manifestations. As Truinject cannot satisfy that requirement for a finding of apparent authority, there is no reason to permit additional discovery on this theory.[12] As to (2), Truinject has failed to explain how additional jurisdictional discovery would help it establish that Nestlé Skin Health, S.A. received a direct (as opposed to an indirect) benefit under the 2014 and 2016 CDAs, and I do not understand how it could.

"To grant plaintiffs['] request for a period of jurisdictional discovery under such circumstances would be to allow plaintiff to 'undertake a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery.'" *Registered Agents, Ltd. v. Registered Agent, Inc.*, 880 F. Supp. 2d 541, 548 (D. Del. 2012) (quoting *Eurofins Pharma*, 623 F.3d at 157). As Truinject has failed to set forth factual allegations that suggest the possible existence of facts that would support personal jurisdiction over Nestlé Skin Health, S.A., Truinject's request for jurisdictional discovery must be denied.

---

[12] Nor has Truinject made any "reasonably particular" factual allegations suggesting that Galderma Labs had actual authority to bind Nestlé Skin Health, S.A., and the uncontroverted declarations submitted to the Court establish that it did not. (D.I. 135; D.I. 150.)

## IV. CONCLUSION

Truinject has failed to establish a *prima facie* case of personal jurisdiction over Nestlé Skin Health, S.A. Accordingly, I recommend that Nestlé Skin Health, S.A.'s 12(b)(2) motion to dismiss for lack of personal jurisdiction be GRANTED. I also conclude that Truinject's request for jurisdictional discovery should be DENIED. Because the Court lacks personal jurisdiction over Nestlé Skin Health, S.A., there is no need to assess its alternative argument that the Amended Complaint fails to state a claim against it.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated: December 13, 2019      _____
                                 The Honorable Jennifer L. Hall
                                 United States Magistrate Judge