**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TRUINJECT CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-592-LPS-JLH |
| | ) | |
| NESTLÉ SKIN HEALTH, S.A., GALDERMA, | ) | |
| S.A., GALDERMA LABORATORIES, L.P., | ) | |
| NESTLÉ SKIN HEALTH, INC., JOHN | ) | |
| ROGERS, STUART RAETZMAN, SCOTT | ) | |
| MCCREA, ALISA LASK and TIPHANY | ) | |
| LOPEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Truinject Corp. ("Plaintiff" or "Truinject") filed this suit against Nestlé Skin Health, S.A., Galderma, S.A., Galderma Laboratories, L.P. ("Galderma Labs"), Nestlé Skin Health, Inc. (collectively, "Corporate Defendants"), John Rogers, Stuart Raetzman, Scott McCrea, Alisa Lask, and Tiphany Lopez (collectively, "Individual Defendants"), alleging breach of contract, fraud, patent infringement, trade secret misappropriation, and other related claims. (D.I. 112.)

Truinject alleges that it developed a training platform to teach medical professionals the proper technique for facial injections of neurotoxins (*e.g.*, Botox) and dermal fillers (*e.g.*, collagen). The platform includes a lifelike model of a human head, a syringe, and a computer interface that allows the user to see the location of the syringe needle in the model. Truinject is the assignee of multiple patents covering its technology.

Beginning in 2014, Truinject and some of the Corporate Defendants (who are all related) discussed potential business deals relating to Truinject's technology. These discussions continued

for several years, but a deal was never consummated. Instead, some of the Corporate Defendants developed and launched their own competing injection training platform. The heart of Truinject's case is its allegation that Defendants misrepresented their interest in a business deal with Truinject in order to induce it to disclose its confidential information and trade secrets, which Defendants then used to develop a competing and infringing product.

Defendants filed five separate motions to dismiss. Nestlé Skin Health, S.A. moved to dismiss all claims against it for lack of personal jurisdiction under Rule 12(b)(2) or, in the alternative, for failure to state a claim under Rule 12(b)(6). In the remaining four motions, at least one defendant moved to dismiss each of the following counts for failure to state a claim under Rule 12(b)(6): Count I (breach of contract); Count II (breach of the implied covenant of good faith and fair dealing); Count IV (breach of the implied covenant); Count V (breach of contract); Count VI (breach of the implied covenant); Count VII (breach of contract); Count VIII (breach of the implied covenant); Count IX (breach of contract); Count X (breach of the implied covenant); Count XI (tortious interference); Count XVI (trade dress infringement); Count XIX (fraud); Count XX (fraud); Count XXI (fraud); Count XXII (fraud); Count XXIII (aiding and abetting); Count XXIV (fraud); and Count XXV (unfair competition).

On December 13, 2019, I issued a Report and Recommendation in which I recommended granting Nestlé Skin Health, S.A.'s motion to dismiss for lack of personal jurisdiction. (D.I. 169.) This Report and Recommendation resolves the remaining motions. For the reasons set forth below, I recommend that Galderma, S.A.'s and Galderma Labs' motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART, that Nestlé Skin Health, Inc.'s motion be GRANTED-IN-PART and DENIED-IN-PART, and that the Individual Defendants' motions be GRANTED. I

further recommend that Truinject be granted leave to amend its complaint to address the deficiencies within 21 days.

## I.    BACKGROUND[1]

Facial injections of neurotoxins and dermal fillers are becoming increasingly popular and create billions of dollars in revenue. (D.I. 112 ¶ 1.) Unfortunately, complications can occur and may include blindness, vision impairment, stroke, cheek rot, drooping eyelids, and misshapen facial features. (*Id.* ¶¶ 2-4, 48.) Many complications stem from inadequate training of the doctors who perform the injections. (*Id.* ¶ 5.) Before the technology at issue in this case, doctors learned to inject by practicing on either cadavers or live patients. (*Id.* ¶¶ 73-74.)

The founder of Truinject, Gabrielle Rios, recognized that inadequate training contributed to complications, and she conceived of a solution: "a sophisticated injection training platform, a virtual and augmented reality training system, and an interactive training application on tablets, all of which allow providers to refine their technique by repeatedly performing injections and receiving immediate feedback, all without exposing patients to the complications of bad injections." (*Id.* ¶¶ 6-10, 47-49.) Truinject subsequently developed technology "consist[ing] of an injectable, anatomically correct simulated face model," referred to as "Kate," and a smart syringe that allows medical professionals to practice injections. (*Id.* ¶ 51.) Truinject also developed an accompanying virtual and augmented reality platform and an interactive iPad app (collectively, the "Truinject Platform"), which aid in teaching the proper injection technique. (*Id.* ¶¶ 10-11, 51-52, 71.) Truinject holds at least three United States Patents protecting the Truinject Platform: U.S. Patent No. 9,792,836 ("'836 patent"), U.S. Patent No. 10,290,231 ("'231 patent"), and U.S. Patent No. 10,290,232 ("'232 patent"). (*Id.* ¶¶ 53, 57, 60.)

---

[1] I assume the facts alleged in the Amended Complaint to be true for purposes of resolving the motions to dismiss for failure to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

After hearing about the Truinject Platform, several companies, including Defendant Galderma Labs, "approached Truinject to develop a business relationship for the technology and science." (*Id.* ¶ 15.) Galderma Labs is an indirect subsidiary of Defendant Nestlé Skin Health, S.A., a Swiss corporation. (D.I. 112 ¶ 34; D.I. 161.) Galderma, S.A. is a wholly-owned subsidiary of Defendant Nestlé Skin Health, S.A. (D.I. 112 ¶ 31; D.I. 161.) Defendant Nestlé Skin Health, Inc. is a Delaware corporation and is a wholly-owned subsidiary of Nestlé Skin Health, S.A. (D.I. 112 ¶ 33; D.I. 161.)

In early 2014, an executive at Galderma Labs, Elizabeth Bentley, told Rios that Galderma Labs was interested in a potential partnership with Truinject. (D.I. 112 ¶ 90.) Bentley introduced Rios, via email, to several other employees of Galderma Labs, and they scheduled a phone meeting for September 5, 2014. (*Id.* ¶¶ 91-92.) Several executives participated on behalf of Galderma Labs, including Per Lango and Defendant Alisa Lask. (*Id.* ¶ 92.)

After the phone meeting, Galderma Labs arranged for Truinject to give a presentation on the Truinject Platform at Galderma Labs' headquarters in Texas. (*Id.* ¶ 17.) During the October 21, 2014 presentation, Truinject demonstrated Kate's functionality. (*Id.* ¶ 93.) Numerous employees from Galderma Labs "or affiliate[s]" attended the presentation, including Defendant Dr. John Rogers ("Rogers"). (*Id.* ¶¶ 94-95.) Lask asked Truinject to send its presentation slides to Rogers. (*Id.* ¶ 96.) Rogers also sent an email to Rios, stating that his job responsibility at Galderma[2] "will be do [sic] develop and shape the educational platforms for training physicians

---

[2] The Amended Complaint quotes an email from Rogers as follows: "Rogers emailed Ms. Rios, stating that '[a] major responsibility for me while at Allergan, and now at [Nestlé Skin Health], will be do [sic] develop and shape the educational platforms for training physicians on injection technique.'" (¶ 104.) Since the Amended Complaint broadly defines "Nestlé Skin Health" to mean all of the Corporate Defendants, I asked Truinject's counsel at oral argument what the bracketed language actually said. Counsel responded that the bracketed language, in fact, stated "at Galderma." (Tr. 130:3-131:20.)

on injection technique" and that what Truinject was developing was "very much to [his] heart [sic]." (*Id.* ¶ 103.)

After the presentation, Lango expressed interest on behalf of Galderma Labs in buying global rights to Truinject's technology, and he requested a period of exclusivity during the due diligence process. (*Id.* ¶ 97.) The next day, on October 22, 2014, Rios, Lango, and Defendant Scott McCrea, Director of Business Development for Galderma Labs, had a call to further discuss a potential business relationship. (*Id.* ¶ 107.)

Galderma Labs and Truinject subsequently signed a Confidential Disclosure Agreement ("2014 CDA"). (*Id.* ¶ 98, Ex. 4.) The preamble to the CDA states that it is "made this 23rd day of October, 2014 . . . , between **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." (*Id.*, Ex. 4 at 1.) The 2014 CDA does not define "Affiliates." The agreement contemplates that the parties would exchange confidential information in connection with a "possible business or collaborative opportunity with regard to Truinject's proprietary technology." (*Id.*) In Paragraph 2.0, the parties agree "to hold in confidence and not publish or disclose the other's Confidential Information" and to use it "solely in connection with the Business Relationship and for no other use or purpose whatsoever." (*Id.*) Paragraph 9.2 provides that the state and federal courts in Delaware will "have exclusive jurisdiction to resolve any claim or matter arising out of or in connection to" the agreement. (*Id.*, Ex. 4 at 2.)

Rios signed the 2014 CDA on behalf of "TruInject Medical Corp." on October 27, 2014. (*Id.*, Ex. 4 at 3.) Quintin Cassady, Vice President of Galderma Labs, signed on behalf of "Galderma Laboratories, L.P." on October 29, 2014. (*Id.*) The 2014 CDA contains no signature block (or signature) for any "affiliates" of Galderma Labs. (*Id.*) Relying on the 2014 CDA,

Truinject "provided [] Defendants with access to trade secrets and confidential information, including the names of vendors and information about Kate." (*Id.* ¶ 102.)

On October 28, 2014, McCrea told Rios that a partnership with Truinject would result in a global deal that would benefit both companies. (*Id.* ¶ 108.) McCrea also discussed entering into an exclusivity arrangement with Truinject during the due diligence process. (*Id.* ¶¶ 108-109.) He asked Rios to cancel all pending meetings that Truinject had scheduled with other interested potential partners. (*Id.*) Truinject refused to cancel previously scheduled meetings. (*Id.* ¶ 110.)

McCrea called Rios again on November 5, 2014 and emphasized the need for an exclusivity agreement. (*Id.* ¶ 111.) He also discouraged Rios from working with Defendants' competitors, who, according to McCrea, would steal Truinject's technology. (*Id.* ¶ 111.) During the call, McCrea promised that his company would not steal the technology and that they were serious about a deal. (*Id.*) Relying on McCrea's representations, Truinject canceled its scheduled meetings with Defendants' competitors. (*Id.* ¶ 112.)

On November 6, 2014, during an industry conference in San Diego, Truinject and several of the Corporate Defendants' employees had a private meeting. (*Id.* ¶ 113.) In attendance was Nestlé Skin Health, Inc.'s CEO, Didier Leclerqc. During the meeting, Truinject gave a live demonstration of Kate and allowed the attendees to simulate injections. (*Id.*) Leclerqc also took the syringe apart and examined it. (*Id.* ¶ 114.)

On November 10, 2014, Galderma, S.A. and Truinject signed an Exclusive Negotiation Agreement ("2014 ENA"), with an effective date of November 5, 2014. (*Id.* ¶ 116.) Under the 2014 ENA, Galderma S.A. and its affiliates received a ninety-day exclusive right to evaluate the technology and negotiate a deal with Truinject. (*Id.* ¶ 117, Ex. 5 at 1.) The ENA also imposes certain restrictions and obligations on Galderma, S.A. For example, Paragraph 3 provides that in

exchange for the receipt of Truinject's confidential information, for a period of nine months "Galderma shall not, and shall not cause its Representatives, to directly or indirectly: (i) enter the market with any product or system that is substantially similar in functionality as the Truinject System" or "(ii) engage in development of any Alternative Systems." (D.I. 112, Ex. 5 at 2.) Paragraph 5 requires each party to hold any information it receives from the other in the "strictest confidence." (*Id.*) Rios signed the 2014 ENA on behalf of "TRUINJECT MEDICAL CORP." (*Id.*, Ex. 5 at 3.) Christian Matton, Vice-President and Corporate General Counsel, signed on behalf of "GALDERMA S.A." (*Id.*)

Another meeting was scheduled for December 16, 2014. (*Id.* ¶ 133.) McCrea told Rios that the meeting "would allow Galderma to take a huge step forward towards being able to present plans about Galderma's proposed uses for the Truinject Platform." (*Id.* ¶ 138.) In reliance on McCrea's expression of continued interest, Truinject gave another full presentation and demonstration of the Truinject Platform at the December 16 meeting. (*Id.* ¶ 140.) Following the presentation, Galderma Labs told Truinject that it was interested in acquiring exclusive global rights to the Truinject technology for a term of 100 years in exchange for a $50 million upfront payment and lifetime royalties. (*Id.*) Lango told Rios that "partnering with 'Uncle Nestlé' would 'catapult her' and Truinject into the global market." (*Id.* ¶ 140.) McCrea and Brant Schofield, Vice President of New Business at Galderma S.A., told Rios that "her children and her children's children would be taken care of for life." (*Id.* ¶ 141.) Rios subsequently received an email from a Galderma Labs' Vice President in which he expressed his appreciation and stated that they would move forward with the deal process discussed at the meeting. (*Id.* ¶ 143.)

On December 21, 2014, McCrea called Rios to discuss including Truinject in a January 10, 2015 meeting with Galderma's Key Opinion Leader Advisory Board. (*Id.* ¶ 147.) McCrea told

Rios that this would be the "final due diligence meeting between Galderma and Truinject." (*Id.*) In a December 22, 2014 email, McCrea outlined the agenda for the meeting. (*Id.* ¶ 149.) Truinject believed that the proposed agenda "went beyond the due diligence and collaborative effort" promised by McCrea, and Truinject responded with its own terms. (*Id.* ¶¶ 150-151.) When Galderma Labs and McCrea refused to modify the proposed agenda, Truinject declined to move forward with the January 10 meeting. (*Id.* ¶¶ 154-156.)

After that, deal discussions broke down and the parties had limited interactions until 2016. (*Id.* ¶¶ 163-169.) In the meantime, according to the Amended Complaint, Defendants began developing a similar technology to compete with Truinject's Platform. (*Id.* ¶ 168.)

In early 2016, Galderma, S.A.'s CEO, Defendant Stuart Raetzman, "contacted Truinject expressing a renewed interest in Truinject's technology." (*Id.* ¶ 173.) Galderma Labs and Truinject subsequently signed another Confidential Disclosure Agreement ("2016 CDA"). (*Id.* ¶ 175, Ex. 6.) The preamble to the CDA states that it is "made this 18th day of February, 2016 . . . , between **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." (*Id.*, Ex. 6 at 1.) Like the 2014 CDA, the 2016 CDA does not define "Affiliates." In Paragraph 2.0, the parties agree "to hold in confidence and not publish or disclose the other's Confidential Information" and to use it "solely in connection with the Business Relationship and for no other use or purpose whatsoever." (*Id.*) Paragraph 9.2 provides that the state and federal courts in Delaware will "have exclusive jurisdiction to resolve any claim or matter arising out of or in connection to" the agreement. (*Id.*, Ex. 6 at 2.) Rios signed the 2016 CDA on behalf of "TruInject Medical Corp." on February 18, 2016. (*Id.*, Ex. 6 at 3.) Quintin Cassady, Vice President of Galderma Labs, signed on behalf of

"Galderma Laboratories, L.P." on February 23, 2016. (*Id.*) The 2016 CDA contains no signature block (or signature) for any "affiliates" of Galderma Labs. (*Id.*)

After the CDA was executed, Raetzman scheduled a meeting for February 19, 2016 to discuss a potential deal. (*Id.* ¶ 180.) In attendance were Rios, another representative from Truinject, Raetzman, Galderma Labs' McCrea, and Pierre Streit, CFO of Nestlé Skin Health, S.A. (*Id.* ¶ 181.) Truinject gave a presentation and a demonstration of Kate. (*Id.* ¶ 180.) The attendees also discussed "the value drivers and benefits" of a partnership and business and marketing plans. (*Id.*)

Truinject met with Raetzman, McCrea, and Streit again on March 5, 2016. (*Id.* ¶ 182.) Raetzman expressed interest in a global license of Truinject's technology. (*Id.*) Raetzman also stated that Defendant Rogers' review of the technology would be the "final step" in the due diligence process. (*Id.* ¶ 183.) Raetzman further stated that Defendants "did not have the core competency to recreate what Truinject had done." (*Id.*)

There was another call on April 18, 2016. (*Id.* ¶ 191.) Rogers was present on the call. (*Id.*) During the call, Galderma "advised Truinject that their due diligence would need to include a firsthand interactive demonstration of Kate and that Rogers would need to attend and inject on Kate." (*Id.*) Between May and December 2016, Rogers and others asked Truinject for updates related to its development of the technology. (*Id.* ¶¶ 194-199.)

During the same time period, two Galderma Labs drug sales representatives, Defendant Tiphany Lopez and Chad Tisckos,[3] contacted Truinject in relation to the SHIELD program, which allowed the top sales associates to pitch potential business or investment opportunities. (*Id.* ¶ 200.)

---

[3] Paragraph 30 of the Amended Complaint alleges that Lopez worked for Defendant Galderma Labs "at all relevant times." The Amended Complaint does not indicate which entity Tisckos worked for.

Truinject provided them with confidential information about Kate and the Truinject Platform. (*Id.* ¶¶ 202-203.) Tisckos signed a Confidential Disclosure Agreement at Truinject's offices that required him, Lopez, and at least one of the Corporate Defendants (the Amended Complaint doesn't specify which) to use Truinject's confidential information "only for the Purpose of the Agreement" and to "hold the disclosure of Confidential Information in confidence." (*Id.* ¶ 204.) Lopez subsequently pitched Truinject to the SHIELD program. (*Id.* ¶ 242.)

On February 7, 2017, Rogers visited the Truinject facilities to conduct a comprehensive review of the Truinject Platform, the "final" step in the due diligence process. (*Id.* ¶ 208.) Rios told Rogers that he must sign a non-disclosure agreement "due to possible exposure to confidential information, technology currently being developed, and Truinject's trade secrets." (*Id.* ¶ 209.) Rogers called counsel for advice and then signed the agreement ("2017 CDA"). (*Id.* ¶¶ 211-13.) The preamble to the 2017 CDA states that the parties to the agreement are "Galderma and Truinject Medical Corp." (*Id.*, Ex. 7.) "Galderma" is not defined. The 2017 CDA sets forth confidentiality obligations and requires that confidential information be used solely for purpose of the agreement. (*Id.*, Ex. 7 ¶ 3.) It further provides that the agreement "shall be governed by the laws of the State of California." (*Id.*, Ex. 7 ¶ 14.)

After signing the 2017 CDA, Rogers spent an hour and a half testing the Truinject Platform. (*Id.* ¶¶ 215-219.) After his visit, communications from Defendants to Truinject ceased. (*Id.* ¶¶ 220-223.) Despite Truinject's efforts to reach out and move forward with a potential deal, Truinject heard nothing further from Defendants. (*Id.*)

In Spring 2018, over a year after Rogers' visit, Truinject learned that Nestlé Skin Health, Inc. had introduced its own injection training simulator platform, named "Holly." (*Id.* ¶¶ 226-227.) Nestlé Skin Health, Inc. conducted public demonstrations of Holly as early as March 2018

and subsequently demonstrated it worldwide. (*Id.* ¶¶ 236, 240.) On April 30, 2018, Nestlé Skin Health, Inc. debuted its LucyLive program, an augmented and virtual reality program that accompanied Holly. (*Id.* ¶ 244.) Following the Holly and LucyLive launches, physicians, industry executives, and other providers called and emailed Rios to congratulate her, mistakenly believing that Holly/LucyLive was Truinject's Kate platform. (*Id.* ¶ 246.)

Truinject filed its original Complaint in the Central District of California on October 12, 2018. (D.I. 1.) On December 14, 2018, Galderma Labs moved to dismiss for lack of venue and failure to state a claim (D.I. 34) and, on December 18, 2018, moved to transfer the case to the District of Delaware (D.I. 39). Individual Defendants Lopez, McCrea, and Lask filed motions to dismiss (D.I. 54, 57, 59) and joined Galderma Labs' motion to transfer (D.I. 73). On March 11, 2019, Defendants Galderma, S.A., Nestlé Skin Health, S.A., and Stuart Raetzman also moved to dismiss Truinject's Complaint (D.I. 92, 93) but did not join the motion to transfer. On March 28, 2019, the district court in the Central District of California granted Galderma Labs' motion to transfer and transferred the action in its entirety to the District of Delaware. (D.I. 101.)

On May 29, 2019, Truinject filed an Amended Complaint in this Court. (D.I. 112.) The Amended Complaint contains twenty-five counts:

- Count I – breach of contract (2017 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count II – breach of the implied covenant of good faith and fair dealing (the "implied covenant") (2017 CDA) against Galderma Labs and Galderma, S.A.;

- Count III – breach of contract (2014 ENA) against Galderma, S.A.;

- Count IV – breach of the implied covenant (2014 ENA) against Galderma Labs and Galderma, S.A.;

- Count V – breach of contract (2014 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VI – breach of the implied covenant (2014 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VII – breach of contract (2016 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count VIII – breach of the implied covenant (2016 CDA) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count IX – breach of contract (2017 CDA) against Defendant Rogers;

- Count X – breach of the implied covenant (2017 CDA) against Defendant Rogers;

- Count XI – tortious interference with contractual and prospective contractual relations against Galderma Labs and Galderma, S.A.;

- Count XII – patent infringement ('836 patent) against Nestlé Skin Health, Inc.;

- Count XIII – patent infringement ('231 patent) against Nestlé Skin Health, Inc.;

- Count XIV – patent infringement ('232 patent) against Nestlé Skin Health, Inc.;

- Count XV – trade secret misappropriation under the Defend Trade Secret Act (18 U.S.C. § 1836) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XVI – trade dress infringement (15 U.S.C. § 1125) against Nestlé Skin Health, Inc.;

- Count XVII – violation of Delaware Uniform Trade Secret Act (6 Del. C. §§ 2001-2009) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XVIII – violation of Delaware's Deceptive Trade Practices Act (6 Del. C. §§ 2531-2536) against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.;

- Count XIX – fraud against Defendant Rogers;

- Count XX – fraud against Defendant Raetzman;

- Count XXI – fraud against Defendant Lopez;

- Count XXII – fraud against Defendant McCrea;

- Count XXIII – aiding and abetting fraud against Defendant Lask;

- Count XXIV – fraud against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.; and

- Count XXV – unfair competition under California Business and Professional Code § 17200 against Galderma Labs, Galderma, S.A., Nestlé Skin Health, Inc., and Nestlé Skin Health, S.A.

The Amended Complaint seeks damages and injunctive relief. (*Id.*)

Defendants filed the pending motions to dismiss in July 2019 (D.I. 117, 119, 121, 123, 125), and the parties completed the briefing on October 25, 2019. Truinject requested oral argument (D.I. 147), and I heard oral argument on November 1, 2019. (D.I. 163 ("Tr. __").) On December 13, 2019, I issued a Report and Recommendation in which I recommended that the Court grant Nestlé Skin Health, S.A.'s motion to dismiss for lack of personal jurisdiction (D.I. 123). (D.I. 169.) This Report and Recommendation resolves the remaining pending motions (D.I. 117, 119, 121, 125).

## II.    LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A possibility of relief is not enough. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not. *Id.* at 679. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal marks omitted).

## III. DISCUSSION

### A. FRAUD CLAIMS AGAINST ALL DEFENDANTS (COUNTS XIX-XXIV)

#### 1. The fraud claims are preempted by the DUTSA insofar as they are based on the assertion that Defendants' misrepresentations caused Truinject to disclose its confidential information.

Counts XIX-XXIII assert common law fraud claims against the Individual Defendants and Count XXIV asserts a common law fraud claim against the Corporate Defendants. Defendants move to have all of the fraud claims dismissed as preempted by the Delaware Uniform Trade Secret Act ("DUTSA"). As explained below, insofar as the fraud claims are based on the theory that Defendants misrepresented their interest in a deal to induce Plaintiff to disclose its confidential information, they are preempted by the DUTSA.

The DUTSA provides civil remedies for the misappropriation of trade secrets. 6 Del. C. §§ 2001-2009. "To prove trade secret misappropriation, the plaintiff must demonstrate that: (1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018). As to (4), one way a trade secret can be "improperly . . . disclosed" is if the defendant "[u]sed improper means" to obtain the disclosure, including through "misrepresentation." 6 Del. C. § 2001(1),(2)(b)(1); *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 434 (D. Del. 2005).

The DUTSA expressly states that it "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 Del. C. § 2007(a); *see also Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F. Supp. 635, 637 (D. Del. 1991) ("[Section] 2007 was intended to preserve a single tort cause of action under state law for misappropriation as defined in 6 Del. C. § 2001(2) and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation."). To determine whether a tort claim is preempted by the DUTSA, courts consider whether the claim is "grounded in the same facts" as a misappropriation of trade secrets claim. *Ethypharm*, 388 F. Supp. 2d at 433 (quoting *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2001 WL 541484, at *4 (Del. Super. Ct. Apr. 24, 2001), *aff'd*, 812 A.2d 894 (Del. 2002)); *see also Beard Research, Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010) (quoting *Ethypharm*, 388 F. Supp. 2d at 433). Claims are "grounded in the same facts" if "the same facts are used to establish all the elements of both claims." *Beard Research*, 8 A.3d at 602 (quoting *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 631 F. Supp. 2d 504, 508 (D. Del. 2009)).

For purposes of the preemption analysis, there is no requirement that the information at issue actually qualify as a trade secret. *Ethypharm*, 388 F. Supp. 2d at 433. Accordingly, a fraud claim based on the assertion that a defendant made misrepresentations in order to induce the plaintiff to disclose its confidential information is preempted by the DUTSA. *Id.* at 434. But the statute does not preempt "other civil remedies that are not based upon misappropriation of a trade secret," including those arising out of contract. 6 Del. C. § 2007(b).

In this case, the bulk of the fraud allegations against both the Individual Defendants and the Corporate Defendants are substantially similar. (*See* D.I. 112 ¶¶ 478-90 (Rogers); ¶¶ 491-504

(Raetzman); ¶¶ 505-15 (Lopez); ¶¶ 516-27 (McCrea); ¶¶ 528-537 (Lask); ¶¶ 538-551 (Corporate Defendants).)  The Amended Complaint alleges that each defendant made statements (or directed others to make statements) known by him/her to be false in order to induce Truinject to share its confidential information.  For example, Count XX alleges that, on March 5, 2016, Raetzman falsely told Truinject that Defendants were interested in licensing its technology, despite Raetzman's knowledge that Defendants were developing a competing technology.  (*Id.* ¶¶ 493, 494.)  The Amended Complaint further alleges that Raetzman made that statement (and others) with the intent to deceive Truinject into disclosing its confidential information, and that Truinject "would never have shared its confidential information" if it had "known of the falsity of Raetzman's representations and his true intentions."  (*Id.* ¶¶ 495-500.)  Each of the fraud counts contains similar factual allegations.

Insofar as Truinject's fraud claims against Defendants are based on its assertion that Defendants' misrepresentations caused Truinject to disclose its confidential information to its detriment, they are preempted by the DUTSA.  Accordingly, any fraud claim that relies solely on that theory of liability should be dismissed.

> ### 2. The Amended Complaint fails to state a non-preempted fraud claim against any of the Individual Defendants.

In its briefing and during oral argument, however, Truinject argued that the Individual Defendants' misrepresentations also caused it to suffer a harm independent of the misappropriation of its trade secrets.  In particular, Truinject argues that the Individual Defendants made false statements that were intended to, and did, cause Truinject to delay launching its products and to forego business opportunities with Defendants' competitors.  (*See, e.g.*, D.I. 132 at 4-5; Tr. 71:22-80:21.)

I agree with Truinject that such a claim would not necessarily be preempted because it might not be grounded in the same facts as a trade secret misappropriation claim. A trade secret misappropriation claim requires proof of, among other things, the defendant's improper acquisition of information. Truinject's alternative theory does not require such a showing. Even if Defendants obtained no confidential information from Truinject, Truinject might still have a claim for fraud based on the harm caused by a delayed launch. Moreover, the harm suffered by Truinject as a result of a delayed launch could be independent from any harm resulting from the improper disclosure of its trade secrets. *Cf. Overdrive, Inc. v. Baker & Taylor, Inc.*, No. 5835-CC, 2011 WL 2448209, at *6 (Del. Ch. June 17, 2011) (declining to dismiss fraud claim as preempted by DUTSA when fraud claim alleged an independent harm). The cases cited by Defendants in support of preemption are inapposite, as those cases lacked allegations of harm independent from the harm caused by trade secret misappropriation. *See, e.g., On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1145 (Fed. Cir. 2004) (fraud claim preempted because "the ultimate injury to which the alleged fraud was directed was the misappropriation of [the plaintiff's] trade secrets"); *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-2658 RMW, 2010 WL 2228936, at *12 (N.D. Cal. June 1, 2010); *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002).

The problem for Truinject is that the Amended Complaint does not actually state such a fraud claim against any of the Individual Defendants. To state a claim for common law fraud under Delaware law, the complaint must allege:

> 1) A false representation, usually one of fact . . . ; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.

*Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne*, *Inc.*, 611 A.2d 467, 472 (Del. 1992). Fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud," but "intent [and] knowledge . . . may be averred generally." Fed. R. Civ. P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). "Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time" but requires "alternative means of injecting precision and some measure of substantiation into the[] allegations of fraud." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal marks omitted).

The fraud claims against Rogers, Raetzman, and Lopez do not meet that standard. The Amended Complaint does not allege that any representations made by Rogers, Raetzman, or Lopez were intended to, or did, induce Truinject to stall development of its product or forego business opportunities with other entities. Nor does the Amended Complaint set forth any statements by Rogers, Raetzman, or Lopez[4] from which one could infer their intent to induce Truinject to stall or forego opportunities, or upon which Truinject could have justifiably relied to alter its course of action. The fraud claims against Rogers, Raetzman, and Lopez rest solely on their alleged improper acquisition of confidential information and are preempted by DUTSA. Those claims (Counts XIX-XXI) should therefore be dismissed.

---

[4] At oral argument, Truinject pointed only to statements made by McCrea (discussed below) to support its argument that the Individual Defendants made misrepresentations intended to induce Truinject to stall development and forego business opportunities. (*See* Tr. 81:18-83:11, 116:12-23.) Truinject did not identify any statements by the other Individual Defendants. (*See* Tr. 104:16-116:11.)

As for McCrea, Truinject points to Paragraph 112 of the Amended Complaint (Tr. 81:18-83:11), which alleges that, in November 2014, Truinject "cancel[ed] all meetings that Truinject had scheduled with Defendants' competitors" in reliance on McCrea's assurances that Galderma Labs was interested in a deal with Truinject. (D.I. 112 ¶¶ 107-112.) But the Amended Complaint does not allege that McCrea's 2014 statements about Galderma Labs' interest were false at the time he made them or that McCrea knew they were false. Nor are there any other allegations supporting such an inference. Indeed, the Amended Complaint alleges that Defendants did not begin designing a competing product until much later. (D.I. 112 ¶¶ 168, 232, 327.) The remainder of the allegations against McCrea relate to Defendants' acquisition of confidential information from Truinject, not fraudulent statements by McCrea that induced Truinject to stall launch of its products or forego other business opportunities. As claims based on the improper acquisition of confidential information are preempted by the DUTSA, I recommend dismissing the fraud claim against McCrea (Count XXII).[5]

As for Lask, the Amended Complaint alleges that she aided and abetted fraud by "mastermind[ing]" the Individual Defendants' fraudulent scheme to acquire Truinject's confidential information. Under Delaware law, an aiding and abetting claim requires (1) an underlying tortious act, (2) the defendant's knowledge of the act, and (3) substantial assistance by the defendant. *Trusa v. Nepo*, No. 12071-VCMR, 2017 WL 1379594, at *12 (Del. Ch. Apr. 13, 2017); *see also Brug v. Enstar Grp., Inc.*, 755 F. Supp. 1247, 1256 (D. Del. 1991). For the same

---

[5] The fraud counts against Rogers, Raetzman, Lopez, and McCrea also allege that those Defendants breached a "duty to speak" arising from the 2016 CDA. (D.I. 112 ¶¶ 482, 496, 510, 522.) Truinject does not address or rely on this theory in its opposition to the Individual Defendants' motion to dismiss the fraud claims. Accordingly, I do not address it.

reasons set forth above, Truinject's claim against Lask is preempted by the DUTSA insofar is it is based upon the improper acquisition of Truinject's confidential information. Moreover, because the Amended Complaint fails to allege non-preempted claims of fraud against the other Individual Defendants, there is no underlying wrongful act to which the aiding and abetting claim can attach. *See Cornell Glasgow, LLC v. La Grange Props., LLC*, No. N11C-05013JRS, 2012 WL 2106945, at *11 (Del. Super. Ct. Jun. 6, 2012) ("Like civil conspiracy, aiding and abetting is a derivative tort, there must be an actionable underlying wrong to which the claim of aiding and abetting can attach."); *see also Raul v. Rynd*, 929 F. Supp. 2d 333, 348 (D. Del. 2013) (dismissing aiding and abetting claim because the complaint failed to adequately allege an underlying wrong). Accordingly, I recommend that the claim against Lask (Count XXIII) be dismissed.

### 3. The Amended Complaint fails to state a non-preempted fraud claim against any of the Corporate Defendants.

The fraud claim against the Corporate Defendants (Count XXIV) does not fare any better. As an initial matter, the Amended Complaint bundles together in its fraud claim all of its allegations against all of the Corporate Defendants rather than allege specific acts by each Corporate Defendant. That is insufficient under Rule 9(b). *Cf. REI Holdings, LLC v. LienClear – 00001, LLC*, No. 18-1401 (MN), 2019 WL 3546881, at *6 (D. Del. Aug. 5, 2019) ("Under the heightened pleading standard of Rule 9(b), . . . a complaint is not sufficient where a plaintiff bundles together all defendants under a claim of fraud and omits specific allegations regarding who had a duty to disclose and who breached such a duty."). For this reason alone, the fraud claim against the Corporate Defendants should be dismissed. But there are other reasons too.

The fraud claim is a nonstarter as to Nestlé Skin Health, Inc. Only one of its employees, Didier Leclercq, is even mentioned in the Amended Complaint. (D.I. 112 ¶¶ 113-114, 135.) But there are no allegations that Leclercq made any false statements or that his statements induced any

action or inaction by Truinject. I therefore recommend that the Court dismiss Count XXIV as to Nestle Skin Health, Inc.

As against Galderma Labs and Galderma, S.A., the fraud claim is deficient for the same reasons the fraud claims against the Individual Defendants are deficient. The vast majority of the fraud allegations in the Amended Complaint relate to Truinject's theory that the Corporate Defendants fraudulently misrepresented their interest in a deal with Truinject in order to obtain access to Truinject's confidential information. For the reasons set forth above, any claim based on those allegations is preempted by the DUTSA.

As with the Individual Defendants, Truinject argues that the Corporate Defendants also intended to cause Truinject to delay launching its product and to forego other business opportunities. The problem here again is that the Amended Complaint does not allege that Truinject actually did delay launching its product or abstained from other business opportunities in reliance on misrepresentations by Galderma Labs and Galderma, S.A.[6] *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. May 1, 2013) (fraud claim requires that plaintiff "must in fact have acted or not acted in justifiable reliance on the representation").

Moreover, although the 2014 ENA prevented Truinject from negotiating with other companies during the three-month exclusivity period (D.I. 112 ¶ 117), Truinject does not argue that it was fraudulently induced to enter into the ENA or CDAs. And its briefing appears to

---

[6] As noted above, the Amended Complaint alleges that Truinject canceled meetings with Defendants' competitors in reliance on McCrea's 2014 statements that Galderma Labs was interested in a deal. (D.I. 112 ¶ 112.) But the Amended Complaint does not allege that McCrea's statements about Galderma Labs' interest were false at the time they were made in 2014.

disclaim reliance on such a theory.[7]  (*See* D.I. 130 at 10 n.30.)  Accordingly, I also recommend dismissing the fraud claim against Galderma Labs and Galderma, S.A.

Since the Amended Complaint fails to state a fraud claim against the Corporate Defendants for the reasons set forth above, I do not address their other arguments about its deficiencies.  I recommend that the fraud claim against the Corporate Defendants (Count XXIV) be dismissed.

## B.    BREACH OF CONTRACT CLAIMS AGAINST CORPORATE DEFENDANTS AND ROGERS (COUNTS I, V, VII, IX)

### 1.    The Amended Complaint fails to state a breach of contract claim against Rogers.

Count IX asserts a claim against Rogers for breach of the 2017 CDA.  Rogers moves to dismiss it on the ground that he is not a party to the 2017 CDA.  I agree.

The 2017 CDA states that it is governed by California law.  (*See* D.I. 112, Ex. 7 ¶ 14).  As in Delaware, it is a fundamental principal of California contract law that only parties to a contract are liable for its breach.  *EduMoz, LLC v. Republic of Mozambique*, No. 13-02309-MMM-CWX, 2015 WL 13697385, at *5 (C.D. Cal. Apr. 20, 2015) (collecting cases).  When an agent signs a contract on behalf of a disclosed principal, the agent is not a party to the contract and thus cannot be liable for its breach.  *Id.*; *see also Youngevity Int'l, Corp. v. Smith*, 224 F. Supp. 3d 1022, 1032-33 (S.D. Cal. 2016) (dismissing breach of contract claims against individuals when they signed the contract as agents of a principal).

---

[7] I also reject Truinject's contention that the Galderma Defendants committed fraud when they breached a "duty to disclose" arising from the CDAs.  Parties in an arms' length transaction generally have no duty to speak.  *See Air Prod. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 215 (D. Del. 2017).  A duty to speak arises when there is a special relationship between the parties, such as a fiduciary relationship.  No special relationship is alleged here.  If a contract imposes a duty to speak, a claim for breach of that duty is grounded in contract, not fraud.  *See, e.g., Northpointe Holdings, Inc. v. Nationwide Emerging Managers LLC*, No. 09C-11-141JOH, 2010 WL 3707677, at *7-8 (Del. Super. Ct. Sept. 14, 2010) (dismissing silent fraud claim because parties' relationship was contractual).

The 2017 CDA unambiguously states that the agreement is between "Galderma" and "Truinject Medical Corp." (D.I. 112, Ex. 7.) Galderma and Truinject are defined, collectively, as the "Parties" to the contract. (*Id.*) Rogers is not mentioned in the 2017 CDA, and it does not subject him to any obligations or benefits.

The cases cited by Truinject are inapposite. The contracts in those cases involved corporate officers making personal guaranties. *See Charter Adjustments Corp. v. Tung*, No. A140117, 2015 WL 3796439 (Cal. Ct. App. June 18, 2015); *Sebastian Int'l, Inc. v. Peck*, 195 Cal. App. 3d 803 (Cal. Ct. App. 1987). There is no personal guaranty at issue here.

Under California law, Rogers is not a party to the contract and cannot be liable for its breach. I recommend that Rogers' motion to dismiss the breach of contract claim against him (Count IX) be GRANTED.

### 2. The Amended Complaint fails to state breach of contract claims against Nestlé Skin Health, Inc.

Counts I, V, and VII assert claims against Nestlé Skin Health, Inc. for breach of the 2017 CDA, the 2014 CDA, and the 2016 CDA, respectively. Nestlé Skin Health, Inc. moves to dismiss all three on the ground that it is not a party to any of the agreements. I agree.

As to the 2017 CDA (Count I), Truinject's brief did not respond to Nestlé Skin Health, Inc.'s argument that it is not a party to that agreement. And the argument is a winner. The 2017 CDA unambiguously states that the parties are Galderma and Truinject. Accordingly, I recommend that Count I be dismissed as to Nestlé Skin Health, Inc.

Nor does the Amended Complaint plausibly allege that Nestlé Skin Health, Inc. is a party to the 2014 and 2016 CDAs (Counts V and VII). Both of those agreements are governed by Delaware law. In Delaware, generally only a signatory to an agreement is bound by it. *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch.

1999).  Nestlé Skin Health, Inc. is not a signatory.  The 2014 and 2016 CDAs were signed by Quintin Cassady on behalf of "Galderma Laboratories, L.P."

Truinject points to the preambles to the 2014 and 2016 CDAs, each of which states that the agreement is "made . . . between . . . **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." (D.I. 112, Exs. 4, 6.)  Truinject argues that Nestlé Skin Health, Inc. is an "affiliate" of Galderma Laboratories. L.P. and is therefore a party to, and thus bound by, the agreements.

But the CDAs contain no signature line for any affiliates.  Even assuming for the sake of argument that the preambles' reference to "affiliates" covers Nestlé Skin Health, Inc., the only way it could be a *party* to the CDAs is if the entity who did sign them had actual or apparent authority to bind Nestlé Skin Health, Inc.  There are no allegations in the Amended Complaint plausibly supporting a conclusion that Galderma Labs (a Texas partnership indirectly owned by Nestlé Skin Health, S.A. through multiple layers of corporate formalities) had authority to sign for Nestlé Skin Health, Inc. (a subsidiary of Nestlé Skin Health, S.A.).  Indeed, there are no allegations suggesting that Nestlé Skin Health, Inc. was even aware of the 2014 and 2016 CDAs.  Accordingly, I recommend that Counts V and VII be dismissed as to Nestlé Skin Health, Inc.

### 3. The breach of contract claims should proceed as to Galderma, S.A.

Counts V and VII also assert claims against Galderma, S.A. for breach of the 2014 and 2016 CDAs.  Galderma, S.A. moves to dismiss both on the ground that it is not a party to those agreements.[8]  I recommend that the Court deny Galderma, S.A.'s motion to dismiss Counts V and VII without prejudice to renew its arguments at the summary judgment stage.

---

[8] Galderma, S.A. has not moved to dismiss Count III, which alleges that it breached the 2014 ENA.

Truinject again points to the preambles to the 2014 and 2016 CDAs, which state that they are "made . . . between . . . **GALDERMA LABORATORIES, L.P.,** a Texas limited partnership, . . . and its Affiliates ("Galderma") and **TRUINJECT MEDICAL CORP.** . . . ." Truinject argues that Galderma, S.A. is an "affiliate" and is therefore a party to the agreements.

While Galderma, S.A. did not sign either agreement, there is enough alleged in the Amended Complaint to make it at least plausible that Galderma Labs had apparent authority to sign on Galderma, S.A.'s behalf. "[A]pparent authority (1) results from a manifestation by a person that another is his agent and (2) exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." *Pell v. E.I. DuPont De Nemours & Co.*, 231 F.R.D. 186, 190 (D. Del. 2005) (internal marks omitted); *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 801 (Del. Ch. 2014) ("[A]pparent agency . . . requires that a person's belief in the agency relationship be 'traceable to the principal's manifestations.'" (quoting Restatement (Third) of Agency § 2.03 (2006))).

The Amended Complaint alleges that Galderma S.A. was actively involved in the negotiations with Truinject around the times the CDAs were executed in 2014 and 2016. Indeed, the Amended Complaint alleges that the 2016 CDA was executed as a result of Galderma, S.A.'s CEO, Raetzman, reopening discussions with Truinject. While those facts alone would not justify disregarding corporate formalities, they do at least raise a question as to whether Galderma Labs had apparent authority to sign on Galderma S.A.'s behalf agreements that purport to include Galderma Labs' "affiliates" as parties.

To be clear, I have not made a factual finding that Galderma, S.A. was a party to the CDAs (nor could I at this stage); I merely recommend that Truinject be permitted to move forward with

discovery.[9]  I therefore recommend that the Court deny Galderma, S.A.'s motion to dismiss Counts V and VII without prejudice to renew its arguments at the summary judgment stage.

### C.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST CORPORATE DEFENDANTS AND ROGERS (COUNTS II, IV, VI, VIII, AND X)

Counts II, IV, VI, VIII, and X assert claims against various Corporate Defendants and Rogers for breach of the covenant of good faith and fair dealing with respect to the 2014, 2016, and 2017 CDAs, and the 2014 ENA.  Defendants move to dismiss all of those claims.

Every contract governed by Delaware law is subject to the implied covenant of good faith and fair dealing.  *Fitzgerald v. Cantor*, No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).  The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522-CB, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015) (internal quotations omitted).  The implied covenant does not impose a "free-floating requirement that a party act in some morally commendable sense."  *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182-183 (Del. Ch. 2014), *aff'd,* 2015 WL 803053 (Del. Feb. 26, 2015).  The implied covenant does provide "a way to deal with unanticipated developments or to fill gaps in [a] contract's provisions[,]" *Overdrive*, 2011 WL 2448209, at *8 (internal quotations omitted), but only where it is clear that the parties

---

[9] I also note that letting these two claims survive at this juncture will likely have little or no effect on the scope of discovery.  Galderma, S.A. is going to be a defendant in this case regardless, as it has not moved to dismiss Truinject's claim that it breached the 2014 ENA (which had its own confidentiality obligations).  The breach of contract claims relating to the 2014 and 2016 CDAs are going to proceed against Galderma Labs, as it has not moved to dismiss them.  And whether Galderma, S.A. misused confidential information obtained pursuant to the 2014 and 2016 CDAs is going to be at issue regardless of whether Galderma, S.A. is ultimately found to be liable for any breach.

would have agreed to the obligation had they considered the issue. *Fitzgerald*, 1998 WL 842316, at *1-2. The implied covenant cannot be used when the contract already speaks to the obligation at issue. *See, e.g., Sharma v. TriZetto Corp.*, No. 15-419-LPS, 2016 WL 1238709, at *5 (D. Del. Mar. 29, 2016) (granting motion to dismiss implied covenant claims because "Plaintiffs' allegations relate to conduct governed by the express terms of the SPA" and they failed to allege "facts demonstrating that the parties' conflict falls into a gap in the contract"); *MHS Capital LLC v. Goggin*, No. 2017-0449-SG, 2018 WL 2149718, *12 (Del. Ch. May 10, 2018); *Fisk Ventures, LLC v. Segal*, No. 3017-CC, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) ("[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue.").

Application of the implied covenant is a "limited and extraordinary legal remedy." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010). It is "rarely invoked successfully." *MHS Capital LLC*, 2018 WL 2149718, at *11. To plead a claim for breach of the implied covenant "a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages." *Fortis Advisors*, 2015 WL 401371, at *3; *see also Sharma*, 2016 WL 1238709, at *5; *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *10 (Del. Ch. Dec. 22, 2010) ("Because general allegations of bad faith conduct are not sufficient to state a claim, the plaintiff must allege a specific implied contractual obligation and how the violation of that obligation denied the plaintiff the fruits of the contract.").

### 1. The Amended Complaint fails to state breach of the implied covenant claims against Nestlé Skin Health, Inc. and Rogers because they are not parties to the agreements.

The implied covenant claims against Nestlé Skin Health, Inc. and Rogers are easily disposed of. As explained above, they are not parties to the 2014, 2016, or 2017 CDAs.

Accordingly, they cannot be liable for breach of the implied covenant for any of those agreements. *See Koloni Reklam, Sanayi, Ticaret LTD/STI v. Viacom, Inc.*, No. 16-285-SLR, 2017 WL 726660, at *3 (D. Del. Feb. 23, 2017) (dismissing implied covenant claim because defendant was not a signatory to the contract); *Marino v. Cross Country Bank*, No. 02-65-GMS, 2003 WL 503257, at *7 (D. Del. Feb. 14, 2003) (dismissing implied covenant claim against an individual defendant because he was not a party to the agreement); *see also Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968-69 (N.D. Cal. 2010).

I recommend that Counts VI (2014 CDA) and VIII (2016 CDA) be dismissed as to Nestlé Skin Health, Inc. I recommend that Count X (2017 CDA) be dismissed as to Rogers.

### 2. The Amended Complaint fails to state a breach of the implied covenant claim with respect to the 2014 ENA.

In Count IV, Truinject alleges that the Galderma Defendants breached the implied covenant of good faith and fair dealing in the 2014 ENA by doing the following: (1) "misrepresent[ing their] intentions in terms of a business relationship between Truinject and Galderma"; (2) "misrepresent[ing] that [they] did not have the capability or capacity to compete with Truinject"; and (3) "actively solicit[ing] proprietary information and trade secrets from Truinject in order to advance their own competing project, Holly." (D.I. 112 ¶ 375.) Truinject's allegations are insufficient to state a claim for breach of the implied covenant.

To survive a motion to dismiss, Truinject must allege an implied contract term that it would have the Court read into the 2014 ENA. The Amended Complaint does not do that. The first two allegations are essentially accusations that Defendants acted in bad faith. Without an allegation directed to the existence of a gap in the contract and a specific obligation that should be implied to fill it, a breach of the implied covenant claim cannot survive.

The third allegation, that Defendants sought Truinject's information to advance their own project, is directly addressed by the ENA itself. It contains provisions addressing the parties' confidentiality obligations and Defendants' agreement not to compete. Paragraph 3 prohibits Galderma, S.A. from developing or launching a competing product for a period of nine months and Paragraph 5 imposes confidentiality obligations. (D.I. 112, Ex. 5 at 1-2.) Because Defendants' alleged use of confidential information is already covered by the express terms of the ENA, it cannot support a breach of the implied covenant claim.

I recommend that Galderma, S.A.'s and Galderma Labs' motions to dismiss Count IV be GRANTED.

### 3. The Amended Complaint fails to state a breach of the implied covenant claim with respect to the 2014 and 2016 CDAs.

In Counts VI and VIII, Truinject alleges that the Galderma Defendants breached the implied covenant of good faith and fair dealing in the 2014 and 2016 CDAs by doing the following: (1) "[m]isrepresenting [their] intentions to do a deal with Truinject"; and (2) "[a]ctively soliciting proprietary information and trade secrets from Truinject in order to advance their own competing project, Holly." (D.I. 112 ¶¶ 389, 404.) Here, again, Truinject's allegations are insufficient to state a claim for breach of the implied covenant.

The essence of the first allegation is that Defendants failed to act in good faith. As explained above, that is not enough to state a claim for breach of the implied covenant. As to the second allegation, Paragraph 2.0 of the CDAs already addresses the purposes for which the confidential information exchanged under the agreement could be used. (D.I. 112, Ex. 3, 5 ¶ 2.0 (requiring the parties to use the confidential information "solely in connection with the Business Relationship and for no other use or purpose whatsoever"). There is no gap to be filled in the

CDAs by implied contractual terms. Accordingly, I recommend that Counts VI and VIII be dismissed as to Galderma Labs and Galderma S.A.[10]

### 4. The Amended Complaint fails to state a breach of the implied covenant claim with respect to the 2017 CDA.

In Count II, Truinject alleges that the Galderma Defendants breached the implied covenant of good faith and fair dealing in the 2017 CDA by doing the same things alleged in Count IV: (1) "misrepresent[ing their] intentions in terms of a business relationship between Truinject and Galderma"; (2) "misrepresent[ing] that [they] did not have the capability or capacity to compete with Truinject"; and (3) "actively solicit[ing] proprietary information and trade secrets from Truinject in order to advance their own competing project, Holly." (D.I. 112 ¶ 361.) Count II also fails to state a claim.

The 2017 CDA is governed by California law, so California law applies to the breach of the implied covenant claim as well. Like in Delaware, California law requires the duty sought to be implied to have a relationship to the express terms of the agreement. *Carragher v. Fed. Home Loan Mortg. Corp.*, No. 11-8291, 2012 WL 13012475, at *5 (C.D. Cal. Mar. 19, 2012); *see also Racine & Laramie, Ltd. v. Dept. of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (Cal. Ct. App. 1993) ("[T]he implied covenant is limited to assuring compliance with the express terms of the contract . . . ."). Moreover, there can be no implied covenant claim if the contract already speaks to the obligation at issue. *Carragher*, 2012 WL 13012475, at *5.

---

[10] In its briefing and at oral argument (but not in the Amended Complaint) Truinject also asked the Court to imply into the CDAs the requirement that Defendants notify Truinject when they are no longer interested in business relationship. (D.I. 130 at 17; Tr. 152:23-153:4.) Even if that were properly alleged in the Amended Complaint, I would recommend rejecting it as a basis for an implied covenant claim. Truinject has not plausibly alleged that the parties' conduct falls into a "gap" in the CDAs or that the parties would have agreed to such a provision. The Court may not second-guess the parties' agreement. *See Nemec*, 991 A.2d at 1126 ("Parties have a right to enter into good and bad contracts, the law enforces both.").

Truinject's implied covenant claim with respect to the 2017 CDA fails for the same reasons its other implied covenant claims fail. The Amended Complaint fails to allege what term Truinject seeks to imply into the 2017 CDA. The first two allegations merely allege that the Defendants misrepresented their purpose for entering into the agreement. The third allegation, that Defendants used Truinject's information to advance their own project, is already addressed by the 2017 CDA. It contains an express provision requiring the party receiving confidential information to use it "only for the Purpose of the Agreement." (D.I. 112, Ex. 7 ¶ 3.) Accordingly, the third allegation cannot support a breach of the implied covenant claim. I recommend that Count II be dismissed as to Galderma Labs and Galderma S.A.[11]

In sum, I recommend dismissing all of the implied covenant claims (Counts II, IV, VI, VIII, and X) against all remaining Defendants.

### D. TORTIOUS INTERFERENCE WITH CONTRACTUAL AND PROSPECTIVE CONTRACTUAL RELATIONS (COUNT XI)

Count XI asserts claims against Galderma Labs and Galderma, S.A. for tortious interference with contractual relations and tortious interference with prospective contractual relations. I agree with the Galderma Defendants that both claims should be dismissed.

"Under Delaware law, the elements of a claim for tortious interference with a contract are well established: (1) a contract, (2) about which defendant knew and (3) an intentional act that is

---

[11] Here, too, Truinject's briefing asks the Court to imply into the 2017 CDA a requirement that Defendants notify Truinject when they are no longer interested in business relationship. (D.I. 130 at 15.) Even if that were properly alleged, I would recommend rejecting it as a basis for an implied covenant claim. The 2017 CDA expressly acknowledges that Galderma "may currently be developing, or in the future may develop" competing products. There is no contractual requirement that Galderma notify Truinject of such fact, and the implied covenant cannot be used to add additional obligations to the parties' agreement. (D.I. 112, Ex. 7 ¶ 9.) *See Racine & Laramie*, 11 Cal. App. 4th at 1032 ("If there exists a contractual relationship between the parties, . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract.").

a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Overdrive*, 2011 WL 2448209, at *9 (internal quotations omitted). Here, the Amended Complaint fails to state a claim for tortious inference with contractual relations because it fails to identify a contract between Truinject and a third party that the Galderma Defendants allegedly interfered with.

The elements of a claim for tortious interference with a prospective business relationship are also well established: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Enzo Life Sci., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003). To adequately plead the claim, the factual allegations must "establish some basis of a bona fide expectancy" of the plaintiff's relationship with a third party. *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, C.A. No. N15C-03-241 WCC, 2015 WL 6772638, at *7 (Del. Super. Ct. Nov. 2, 2015). In addition, the plaintiff must allege that the third party "was prepared to enter into a business relationship but was dissuaded from doing so by the defendant." *GWO Litig. Trust v. Sprint Sols., Inc.*, C.A. No. N17C-06-356 PRW, 2018 WL 5309477, at *12 (Del. Super. Ct. Oct. 25, 2018); *see also CapStack Nashville 3 LLC v. MACC Venture Partners*, No. 18-552, 2018 WL 3949274, at *7 n.70 (Del. Ch. Aug. 16, 2018).

Among other problems, the Amended Complaint in this case fails to allege facts suggesting that the Galderma Defendants dissuaded any third parties from doing business with Truinject. Accordingly, it fails to state a claim for tortious interference with prospective business relations.

I recommend that the Galderma Defendants' motion to dismiss Count XI be GRANTED.

### E. TRADE DRESS INFRINGEMENT (COUNT XVI)

Count XVI asserts a claim against Nestlé Skin Health, Inc. for trade dress infringement. Nestlé Skin Health, Inc. moves to dismiss it on the basis that it fails to state a claim. I disagree.

"'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003). Trade dress is the "overall look of a product or business" and "'includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir. 2014) (quoting *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000)). Trade dress is protectable if: "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007). In addition, the plaintiff must articulate the specific elements that comprise the trade dress for which it is seeking protection. *Fair Wind Sailing*, 764 F.3d at 309; *see also Tristar Prod., Inc. v. E. Mishan & Sons, Inc.*, No. 17-1204 (RMB/JS), 2017 WL 1404315, at *7 (D.N.J. Apr. 19, 2017).

Here, Truinject articulates the specific elements of the trade dress for which it is seeking protection. According to the Amended Complaint, Kate's trade dress "includes the size and placement of the wrinkles around the eyes, the brow and lips, beauty marks by the mouth, the scrub hat, the colors used to highlight different anatomical features on the visual display, the combination of a Kate, the syringe and display, and the overall shape, coloration and look of the syringe and the head." (D.I. 112 ¶ 290.)

Nestlé Skin Health, Inc. argues that the Amended Complaint fails to state a claim because the identified design elements are "functional." Whether an element is functional, however, is a question of fact.[12] *Shire US Inc.*, 329 F.3d at 355; *see also Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987) ("The issue of functionality has been consistently treated as a question of fact."). Thus, the determination of whether Kate's "scrub hat," for example, is functional is an inherently factual question not suitable for resolution on a motion to dismiss.

Nestlé Skin Health, Inc. also argues that the Amended Complaint fails to state a trade dress claim because it fails to plausibly allege that Kate has acquired secondary meaning. Secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851, n.11 (1982)). The issue of secondary meaning is also a question of fact.[13] *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862-63 (3d Cir. 1992). Here, the Amended Complaint alleges that Kate's trade dress "has acquired secondary meaning as the purchasing public associates the design of Kate with Truinject" as a result of its demonstrations and advertising. (D.I. 112 ¶ 292.) It

---

[12] In *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, the Supreme Court identified two fact-based tests for functionality. First, "'a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Shire US Inc.*, 329 F.3d at 353-54 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001)). Second, "'a functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Id.* at 354 (quoting *TrafFix Devices*, 532 U.S. at 32).

[13] The Third Circuit has articulated a non-exclusive list of factors to be considered in making the factual determination of secondary meaning: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion." *See, e.g., Tristar Prods.*, 2017 WL 1404315, at *9.

further alleges that some doctors mistook Nestlé Skin Health, Inc.'s Holly for Truinject's Kate, and it alleges that Holly's use of Kate's trade dress is likely to cause confusion about Holly's source. (*Id.* ¶¶ 292, 465.) That is enough at this stage of the litigation.

Nestlé Skin Health, Inc. nevertheless argues that Truinject's Kate could not have acquired secondary meaning prior to Nestlé Skin Health, Inc.'s launch of Holly because Truinject never made a sale of Kate prior to Holly's launch. But none of the cases cited by Nestlé Skin Health, Inc. stand for the proposition that secondary meaning can only be acquired by a sale in commerce. The cases are also inapposite because they do not analyze the sufficiency of allegations at the motion to dismiss stage. *See Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 827 (Fed. Cir. 1992) (rejecting jury's finding of secondary meaning after trial); *HRP Creative Servs. Co. v. FPI-MB Entm't, LLC*, 616 F. Supp. 2d 481, 493 (D. Del. 2009) (concluding at the summary judgment stage that plaintiff's trade dress had not gained secondary meaning). Although Truinject may ultimately find it difficult to demonstrate that its product has acquired secondary meaning given that it has yet to launch, at this early stage of the litigation it has alleged sufficient facts to make it plausible.

I recommend that Defendant Nestlé Skin Health, Inc.'s motion to dismiss Count XVI be DENIED.

## F.     UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS CODE (COUNT XXV)

Count XXV asserts a claim against Galderma Labs, Galderma, S.A., and Nestlé Skin Health, Inc. for violations of California Business and Professions Code ¶ 17200 ("Unfair competition; prohibited activities"). The Corporate Defendants move to dismiss this count on the basis that the Delaware choice of law provisions in the 2014 and 2016 CDAs and the 2014 ENA prohibit Truinject from brining a claim under California law. I disagree.

Significantly, the Corporate Defendants do not argue that the factual allegations fail to set forth a violation of California law.[14] Their sole argument is that a claim cannot be brought under California law because the 2014 and 2016 CDAs and the 2014 ENA specify that Delaware law governs. Plaintiff responds that the choice-of-law provisions set forth in those agreements do not apply to claims not arising under those agreements.

Plaintiff is correct. Each CDA states that "[t]his Agreement shall be governed by, enforced under and construed and interpreted in accordance with the laws of the State of Delaware . . . ." (D.I. 112, Ex. 4, 6.) The ENA likewise states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Delaware." (*Id.*, Ex. 5.) None of those agreements purports to restrict any and all tort claims that the parties had, or may ever after have, to those arising under Delaware law. The cases cited by the Corporate Defendants are inapposite, both because the agreements' choice-of-law provisions were broader in those cases and because the disputed claims related to the agreements themselves. *See Organ v. Byron*, 435 F. Supp. 2d 388, 391-92 (D. Del. 2006) (Delaware choice-of-law provision covering claims arising out of a merger agreement as well as "all Aspects of [the] Agreement" barred plaintiff's claim that the merger violated Illinois securities laws); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006) ("To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.").

---

[14] Indeed, none of the parties have explained (in their briefing or at oral argument) what the elements of the California statutory claim are, nor do they compare Truinject's factual allegations to the required elements.

The Amended Complaint alleges a number of instances of conduct that occurred in California, including John Rogers' visit to Truinject's headquarters on February 7, 2017, during which he allegedly used false pretenses to obtain Truinject's confidential information. The Corporate Defendants have not persuasively explained why a statutory tort claim based on Rogers' February 2017 conduct would be governed by the choice of law provisions in the 2014 and 2016 CDAs—especially since Rogers signed the 2017 CDA on the same day, and it states that it "shall be governed by the laws of the State of California."[15] (*Id.*)

Because the Corporate Defendants have raised no other basis for dismissal of Count XXV, I recommend that the motions to dismiss that Count be DENIED.

---

[15] Nestlé Skin Health, Inc. appears to suggest that the Amended Complaint failed to allege sufficient facts to state a claim against it under the statute, but its argument is based on its contention that such a claim could only have arisen after the 2017 CDA was executed, which I reject. Moreover, the Amended Complaint alleges that Nestlé Skin Health, Inc. engaged in conduct after execution of the 2017 CDA, and Nestlé Skin Health, Inc. has not explained why those allegations fail to state a claim under the statute.

## IV. CONCLUSION

In sum, I recommend the following:

1. Galderma, S.A.'s and Galderma Labs' motion to dismiss (D.I. 117) should be GRANTED with respect to Counts II, IV, VI, VIII, XI, XXIV and DENIED with respect to Count XXV, and DENIED with respect to Galderma, S.A.'s request to dismiss Counts V and VII against it;

2. Nestlé Skin Health, Inc.'s motion to dismiss (D.I. 121) should be GRANTED with respect to Counts I, V, VI, VII, VIII, XXIV and DENIED with respect to Counts XVI and XXV;

3. Defendant John Rogers' motion to dismiss (D.I. 125) should be GRANTED; and

4. Defendants Raetzman, Lopez, McCrea, and Lask's motion to dismiss (D.I. 119) should be GRANTED.

I further recommend that all dismissals be without prejudice and that Truinject be granted leave to amend its operative complaint to address the identified deficiencies within 21 days.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated: January 7, 2020

_____
The Honorable Jennifer L. Hall
United States Magistrate Judge