## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRUINJECT CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-592-LPS-JLH |
| | ) | |
| GALDERMA, S.A., GALDERMA | ) | |
| LABORATORIES, L.P., and SHDS, INC. (f/k/a | ) | |
| Nestlé Skin Health, Inc.), | ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION

Presently pending before the Court is a partial motion to dismiss filed by Defendants Galderma, S.A., Galderma Laboratories, L.P., and SHDS, Inc. (D.I. 215.) As announced at the hearing on August 21, 2020, I recommend GRANTING Defendants' request to dismiss Count VIII and DENYING Defendants' request to dismiss Count XVI of Plaintiff Truinject Corp.'s Second Amended Complaint. My Report and Recommendation was announced from the bench at the conclusion of the hearing as follows:

> This is my report and recommendation on Defendants' motion to dismiss Counts VIII and XVI of the Second Amended Complaint ("SAC"). I will not be issuing a separate written report, but I will issue an R&R that incorporates by reference my ruling today.

> I want to emphasize again before I get into the ruling that while I'm not issuing a written opinion, we have followed a full process for making the decisions that I'm about to state. I reviewed the second amended complaint and the attached exhibits. I reviewed the parties' briefing on the motion to dismiss and accompanying declaration and exhibit, and we heard lengthy oral argument today. All of the submissions and the arguments have been carefully considered.

> For the reasons I will state, I recommend that Defendants' motion be GRANTED-IN-PART and DENIED-IN-PART.

This is my third Report and Recommendation on motions to dismiss filed by various defendants in this matter. Rather than reviewing the entire procedural history of this action, I refer the interested reader to my prior Reports, and Chief Judge Stark's orders adopting them.[1] I will only give an abbreviated version here.

This case was filed by Plaintiff Truinject on October 12, 2018. (D.I. 1.) Truinject filed a First Amended Complaint on May 29, 2019. (D.I. 112.) The First Amended Complaint alleged twenty-five counts, including claims of patent infringement, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, misappropriation of trade secrets, tortious interference, and other claims against Nestlé Skin Health, S.A., Nestlé Skin Health, Inc., Galderma, S.A., Galderma Laboratories, L.P., and a number of individuals. (*Id.*)

Each of the defendants filed motions to dismiss. Consistent with my recommendation, the Court dismissed Nestlé Skin Health, S.A. for lack of personal jurisdiction. (D.I. 169, 193.) Also consistent with my recommendation, the Court granted the remaining defendants' motions to dismiss the fraud claims, the claims for breach of the implied covenant of good faith and fair dealing, and the tortious interference claims. In accordance with my recommendation, the Court also dismissed the contract claims against some, but not all, of the defendants. I recommended, and the Court adopted my recommendation, to deny the defendants' motion to dismiss a trade dress claim and a claim of unfair competition under California Business and Professional Code § 17200. (D.I. 178, 193.) The Court granted Truinject leave to amend to cure the deficiencies.

On April 30, 2020, Truinject filed a corrected Second Amended Complaint. (D.I. 204.) The SAC contains thirteen counts, but they are numbered I to XVI. The SAC names three Defendants: Galderma, S.A., Galderma Labs., L.P., and Nestlé Skin Health, Inc. Nestlé Skin Health, Inc. is now known as SHDS, Inc. The counts labeled I-III and VI are breach of contract claims. Count VIII alleges tortious interference with contractual and prospective contractual relations. Count VIII originally listed all three corporate Defendants, but Truinject stipulated to the dismissal of Count VIII as to SHDS, Inc. on May 27, 2020. (D.I. 213.)

---

[1] *See* D.I. 169, 178, 193; *Truinject v. Nestlé Skin Health, S.A.*, No. 19-592, 2019 WL 6828984 (D. Del. Dec. 13, 2019); *id.*, 2020 WL 70981 (D. Del. Jan. 7, 2020); *id.*, 2020 WL 1322872 (D. Del. Mar. 20, 2020).

Counts IX-XI allege patent infringement.  Counts XII-XV allege trade secret misappropriation, trade dress infringement, a violation of the Delaware Uniform Trade Secret Act, and a violation of Delaware's Deceptive Trade Practice Act, respectively.

Finally, Count XVI alleges a violation of California Business and Professional Code § 17200 against all three Defendants.

On May 28, 2020, the Galderma Defendants moved to dismiss Count VIII, the tortious interference count, and all three Defendants moved to dismiss Count XVI, the California unfair competition count.  (D.I. 215.)

The SAC is 170 pages and contains 682 paragraphs. Because the pending motion only relates to two counts, I'll summarize the facts relevant to those two counts.  I refer the reader to my prior Reports and Recommendations for further details regarding this dispute.  Because this is a motion to dismiss, I take as true Truinject's allegations in the SAC.

Truinject was founded by Gabrielle Rios.  She started the company to solve the problem of inadequate training of medical professionals who perform facial injections of dermal fillers or neurotoxins, such as Botox.  (D.I. 204 ("SAC") ¶¶ 1-3, 5, 7, 30-33, 96-99, 123.)

Truinject developed and patented a training platform that provides real-time feedback to doctors as they practice injections. (*Id.* ¶¶ 33-38, 100.)  The device, called "Kate," "is an injection training device that has a human head model connected to a syringe with a fiber optic tip and a screen that allows the user to see the location, the angle, and the depth of a needle relative to a statistical human anatomy model and can warn a user before performing an improper training injection.  The syringe delivers a simulated dose of neurotoxin/dermal filler and harvests data on the user feedback on his or her injection technique.  The data is used to help a provider improve his or her training technique and to certify that a provider has mastered neurotoxin or dermal filler injections."  (*Id.* ¶ 8; *see also id.* ¶¶ 100-01.)

According to the SAC, Truinject also developed "an augmented reality device that superimposes vascular and muscular structures, nerves and other anatomical features over Kate so that a medical provider can see the anatomy" while they practice injecting.

3

(*Id.* ¶ 9.) Truinject also developed and patented an accompanying interactive tablet application that allows medical providers to see the underlying human anatomy while they practice. (*Id.* ¶ 10.)

During the development process, Truinject negotiated with third-party vendors and contractors to work on specific components of Kate. (*Id.* ¶ 126.) One vendor that Truinject approached was BioDigital. (*Id.* ¶ 126.) According to the SAC, "BioDigital calls itself the 'World's First Human Visualization Platform' that provides 'interactive 3D' visualization of anatomy, diseases and treatments." (*Id.* ¶ 127.)

Truinject approached BioDigital in 2014 to request a proposal to build a computer application to accompany Kate. (*Id.* ¶ 128.) BioDigital entered into a confidential disclosure agreement ("CDA") with Truinject so that Truinject could share its information with BioDigital. BioDigital provided Truinject with a proposal for the requested work, but Truinject ultimately selected another vendor to build the computer application for Kate. (*Id.* ¶¶ 128-30, 534-37.)

According to the SAC, "[m]edical providers and pharmaceutical companies expressed excitement about Truinject's invention as they learned about it." (*Id.* ¶ 39.) Companies such as "Nestlé Skin Health, S.A., Allergan, Merz, Revance and others approached Ms. Rios to develop a business relationship and obtain Truinject's injection training technology and science." (*Id.* ¶ 40.) In early 2014, a representative from Galderma Labs reached out to Ms. Rios and indicated interest in Truinject's technology. (*Id.* ¶¶ 12, 140.) Over the next several years, Truinject and the Galderma parties had multiple in-person and telephonic meetings, and they executed at least three Confidential Disclosure Agreements. (*Id.* ¶¶ 20, 43; *see generally id.* ¶¶ 140-217, 258-312.) The CDAs require the parties to hold each other's confidential information in confidence and to use it solely in connection with the business relationship.

The SAC alleges that, during the parties' discussions and meetings, "Galderma Labs and Galderma, S.A. pressured Ms. Rios and Truinject to cancel meetings Ms. Rios had scheduled with Galderma's biggest competitors, like Allergan and Merz. Ms. Rios, believing that Galderma Labs and Galderma, S.A. were genuine in their interest, canceled the meetings and signed an exclusive negotiation agreement with Galderma, S.A." on November 10, 2014. (*Id.* ¶ 21; *see also id.* ¶¶ 19, 80, 163.) Under the 2014 ENA, Galderma S.A. and its affiliates received a ninety-day exclusive right to evaluate the technology and negotiate a deal with Truinject.

4

(*Id.* ¶ 168.)  During Galderma's due diligence, Truinject disclosed all of its prior dealings with third parties over the course of Kate's development, including Truinject's discussions and CDA with BioDigital.  (*Id.* ¶ 174.)

The discussions between Truinject and Galderma broke down in January 2015, and the parties had limited interactions until 2016.  (*Id.* ¶¶ 215, 221-22.)  The SAC alleges that, during the 2015 to 2016 period, "Truinject communicated with Allergan and Merz in an effort to rekindle their interest in Truinject's technology after Truinject's period of CDA-based exclusivity with Galderma Labs, and its affiliates expired.  But nothing came of those efforts." (*Id.* ¶ 223.)  According to Truinject, "Allergan and Merz stopped being interested in a deal with Truinject as a direct result of [Defendants'] 2015-2016 disinformation campaign against Truinject." (*Id.* ¶ 224.)

That "disinformation campaign" allegedly included the following:

1.     Defendants' employees told "the market" that Ms. Rios and Truinject were difficult to work with and unprofessional. (*Id.* ¶ 226.)

2.     Galderma Labs informed its own employees and its physician consultants at a January 10, 2015 internal meeting that Truinject was a "no-show" and unprofessional. The SAC alleges that some of Galderma's physician consultants also served on advisory boards for Allergan, Merz and Revance.  (*Id.* ¶ 228.)

3.     A Senior Director at Galderma Labs told "the market" that Truinject's technology did not work. (*Id.*)

4.     In July 2016, a vice president at Galderma Labs told "a group of prominent skin doctors and other industry stakeholders" at a dinner that "Truinject's technology is 'not ready,' that Ms. Rios is difficult to work with and that Ms. Rios doesn't know how to run her company." (*Id.* ¶ 229.) The SAC alleges that some of the physicians at the dinner "worked with" Allergan and Merz. (*Id.* ¶ 230.)

5.     In August 2016, Nestlé employees "bad-mouthed" Truinject at a business dinner.  The dinner attendees included "an array of doctors and businesspeople with connections to Merz and Allergan." (*Id.* ¶ 231.)

6.      Also in August 2016, a Galderma Labs employee told a group of fellow employees and Galderma physician advisors that Galderma Labs was building something "far better than what Truinject has." Some of those physician advisors also advised Allergan and Merz.  (*Id.* ¶ 232.)

7.      In December 2016, a Galderma Labs employee told a colleague that Truinject's patents won't "stand up" and that Truinject's technology was not otherwise ready to launch into the market.  (*Id.* ¶ 233.)

8.      At an internal meeting of Galderma Labs and Nestlé Skin Health, S.A. employees and advisors in March 2017, the CEO of Nestlé Skin Health said that Truinject was "stupid."  Some of Defendants' advisory physicians present at the internal meeting were also on advisory boards for Allergan, Merz and Revance. (*Id.* ¶ 234.)

9.      During a May 2018 presentation by Ms. Rios to Revance, a Revance employee who used to work for Galderma repeatedly said the technology did not work and the patents were weak.  (*Id.* ¶ 237.)

10.      Paragraph 678 alleges that Defendants held an internal meeting to discuss Truinject in April 2018.  It goes on to allege that "Defendants further began a disinformation campaign against Truinject and its technology, calling Kate a toy, unrealistic and not focused on improving patient safety." (*Id.* ¶ 678; *see also id.* ¶ 507.)   However, the SAC does not allege that any of those comments were made to anyone external to Defendants.

The SAC alleges that, "Because of what was being said about Truinject, [Ms. Rios'] reception at Merz and Allergan, who were previously enthusiastic about doing a deal, was chilled." (*Id.* ¶ 227.)

In 2018, Nestlé Skin Health, Inc. (now SHDS, Inc.) launched their own competing products, named Holly and LucyLive. (*Id.* ¶ 26.)   Holly closely resembles Kate and LucyLive resembles Truinject's tablet computing application.  (*Id.*)

The SAC alleges that Defendants contracted with BioDigital "to develop the screens for Holly," which contain a virtual anatomy model that can be used to show the location of the needle as a provider is injecting into a physical head.  (*Id.* ¶¶ 560-62.) The SAC further alleges that BioDigital used information it gained from

Truinject when developing the product for Defendants.  (*Id.* ¶ 563-64.)

According to Truinject, "[a]fter launching, [Defendants] . . . took credit in trade meetings and at sales presentations for Truinject's inventions, falsely passing them off as their own while simultaneously disparaging Truinject and Ms. Rios to medical providers and others in the neurotoxin and dermal filler injection trade." (*Id.* ¶ 27.)

That concludes my summary of the factual allegations.  My analysis of those allegations is as follows.

I'm not going to read into the record the standard that applies to a motion to dismiss under Rule 12(b)(6).  I have a standard that I use in my opinions, for example, in my previous R&R in this case at D.I. 178,[2] which I incorporate by reference.

The Galderma Defendants move to dismiss Count VIII, which alleges tortious interference with contractual and prospective contractual relations.  While styled as a single count, Count VIII encompasses two theories of tortious interference.

Truinject's first theory is that the Galderma Defendants tortiously interfered with BioDigital's CDA with Truinject.  "Under Delaware law, the elements of a claim for tortious interference with a contract are well established: (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor

---

[2] *See Truinject Corp.,* 2020 WL 70981, at *7.  A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not.  *Id.* at 679.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (internal marks omitted).

in causing the breach of such contract (4) without justification (5) which causes injury."[3]

The Galderma Defendants argue that Truinject's first theory fails to state a claim of tortious interference. They make four arguments: (i) Truinject fails to plead an underlying breach of contract; (ii) if there was a breach, Truinject fails to plead that the Galderma Defendants engaged in an intentional act that was a significant factor in causing it; (iii) Truinject fails to plead that any such action was without justification; and (iv) the claim is preempted by the Delaware Uniform Trade Secret Act.

I will start with the preemption argument. The Delaware Uniform Trade Secret Act (the "DUTSA") provides civil remedies for the misappropriation of trade secrets.[4] The DUTSA expressly provides that it "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."[5] To determine whether a tort claim is preempted by the DUTSA, courts consider whether the claim is "grounded in the same facts" as a misappropriation of trade secrets claim.[6] The statute explicitly does not, however, displace "civil remedies . . . not based upon misappropriation of a trade secret" or "contractual remedies, whether or not based upon misappropriation of a trade secret."[7]

As I understand Truinject's first theory, it is saying that the Galderma Defendants tortiously interfered with the CDA between Truinject and BioDigital by causing BioDigital to breach the CDA and use Truinject's confidential information to develop Defendants' requested product. The Delaware Supreme Court has not yet addressed whether a claim that a defendant tortiously interfered with a CDA is preempted by the Delaware Uniform Trade Secret Act.

---

[3] *Overdrive, Inc. v. Baker & Taylor, Inc.*, No. 5835-CC, 2011 WL 2448209, at *9 (Del. Ch. June 17, 2011).

[4] 6 Del. C. § 2001, *et. seq.*

[5] 6 Del. C. § 2007(a).

[6] *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (quoting *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2001 WL 541484, at *4 (Del. Super. Ct. Apr. 24, 2001), *aff'd,* 812 A.2d 894 (Del. 2002)).

[7] 6 Del. C. § 2007(b)(1),(2); *Overdrive, Inc.*, 2011 WL 2448209, at *4.

The *Atlantic Medical Specialists* case from the Superior Court for the State of Delaware, cited by Truinject, concluded that such a claim is not preempted.[8]  That case contains a lengthy analysis and it cites a law review article that says that no preemption under these circumstances is the majority view.[9]  I don't know whether that's true or not, but the cases cited by Defendants do not persuade me that the Delaware Supreme Court would have a different view. Accordingly, I'm unpersuaded that Truinject's first theory of tortious interference is necessarily preempted.

That said, I agree with the Galderma Defendants that Truinject's allegations fail to state a claim of tortious interference with contractual relations at least for the reason that the SAC fails to allege an "intentional act" that caused BioDigital to breach its CDA with Truinject.[10]  The SAC alleges that Defendants entered into a relationship with BioDigital to develop the screens for Holly and that BioDigital used the information it gained from Truinject in breach of its CDA with Truinject.  But the SAC does not allege that the CDA between BioDigital and Truinject restricted BioDigital from contracting with Truinject's competitors.  Nor does the SAC allege that Defendants took an intentional act to cause BioDigital to breach its CDA with Truinject, much less facts that would make such an allegation plausible.  For example, there is no allegation that Defendants ever asked or induced BioDigital to use Truinject's information in breach of BioDigital's CDA.

I also agree with the Galderma Defendants that the allegations that they breached their own agreements with Truinject by hiring BioDigital [do not create a plausible inference that the Galderma Defendants intended to cause a breach] of BioDigital's CDA with Truinject.  At best, Truinject alleges two breach of contract claims—one against the Galderma Defendants for breach of their CDAs and ENA with Truinject, and one against BioDigital

---

[8] S*ee Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, No. CV N15C-06-245 CEB, 2017 WL 1842899, at *15–16 (Del. Super. Ct. Apr. 20, 2017).

[9] *See id.* at 16 n.124 (citing John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445, 465 (2010)); *cf. IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 586–87 (7th Cir. 2002).

[10] *See WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) ("Delaware courts follow Section 766 of the Restatement (Second) of Torts in assessing a tortious interference claim."); Restatement (Second) of Torts § 766 (requiring an "intentional[] . . . interfer[ence] with the performance of a contract"); *id.* § 8A cmt. a ("'Intent,' as it is used throughout the Restatement of Torts, has reference to the consequences of an act rather than the act itself.").

for breach of its CDA.  But Truinject has failed to allege that the Galderma Defendants intentionally induced a breach by BioDigital.

For that reason, I conclude that Truinject fails to state a claim of tortious interference with contractual relations under its first theory and I don't reach Defendants' other arguments regarding the first theory.

Truinject's second theory is that the Galderma Defendants tortiously interfered with Truinject's prospective business relations with Allergan, Merz and Revance.  The elements of a claim for tortious interference with a prospective business relationship are also well established: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted."[11]

The Galderma Defendants argue that Truinject has failed to allege either (i) the existence of a valid business expectancy or (ii) intentional interference.  I agree.

Regarding a valid business expectancy, the factual allegations in the complaint must "establish some basis of a *bona fide* expectancy" of the plaintiff's relationship with a third party.[12]  Courts have also phrased this as a "reasonable probability of a business opportunity" with a "party who was prepared to enter into a business relationship."[13]

Here, the allegations regarding Truinject's expectation of doing a deal are conclusory, such as in Paragraph 573: "Truinject had a reasonable expectation of doing a deal with Allergan, Merz, and/or Revance." (SAC ¶ 573.)  With respect to Allergan and Merz, the SAC alleges that Truinject had meetings scheduled with them in 2014 that Truinject canceled because it entered into an exclusive negotiation agreement with the Galderma Defendants.  (*Id.* ¶¶ 19, 21.)  The SAC alleges that after the negotiations with Galderma

---

[11] *Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003).

[12] *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, C.A. No. N15C-03-241 WCC, 2015 WL 6772638, at *7 (Del. Super. Ct. Nov. 2, 2015).

[13] *Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009).

broke down in 2015, "Truinject communicated with Allergan and Merz in an effort to rekindle their interest in Truinject's technology after Truinject's period of CDA-based exclusivity with Galderma Labs, and its affiliates expired.  But nothing came of those efforts." (*Id.* ¶ 223.)

Those allegations do not demonstrate a plausible, *bona fide* expectancy of doing a deal with Allergan or Merz.  In so holding, I recognize that Truinject's theory is that nothing came of its efforts to "rekindle" the interest of Allergan and Merz because Defendants were making negative comments about Truinject.  For the purposes of the argument, I assume that is true.  But that doesn't change the fact that Truinject lacked a *bona fide* expectation of doing a deal with Allergan and Merz at the time that Defendants allegedly made the negative comments.[14]

I have considered Truinject's allegation in Paragraph 256 that it had CDAs with Allergan and Merz in 2015 so that it could share information about its product (SAC ¶ 256), but I have to consider that allegation in view of Truinject's other allegations that they weren't ever able to rekindle the interest of Allergan or Merz. A CDA is not the same level of business dealings as in the cases cited by Truinject.[15]

I also recognize and have considered Truinject's argument that whether there is a reasonable business expectancy is largely a factual issue. However, where there are no facts making such an

---

[14] *See Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) ("We believe that the probability of the business opportunity must be assessed at the time of the alleged interference.").

[15] *See Preston Hollow Capital LLC v. Nuveen LLC*, No. 2019-0169-SG, 2020 WL 1814756, at *13-14 (Del. Ch. Apr. 9, 2020) (the alleged relationships included the following: formalized relationships involving contractual renewals; transactions already in progress at the time of the interference; discussions involving a dozen potential transactions and statements by a third-party that the plaintiff was a part of its business plan; and consistent prior dealings); *Agilent Techs., Inc.*, 2009 WL 119865, at *7-8 (concluding that the detailed factual allegations described a reasonably likely business relationship with a specific third party, even though the third party was not identified by name); *Soterion Corp. v. Soteria Mezzanine Corp.*, No. 6158-VCN, 2012 WL 5378251, at *13 (Del. Ch. Oct. 31, 2012) (factual allegations indicated that the plaintiff had "much more than a 'mere hope' or 'mere perception of a prospective business relationship'" because the plaintiff had "letters of intent" from third parties who had conducted "extensive due diligence activities"); *World Energy Ventures, LLC*, 2015 WL 6772638, at *8 (pleading alleged a plausible *bona fide* business expectancy where it specifically named some third parties that had previously invested in the claimant's prior ventures).

expectancy plausible, dismissing such a claim at the motion to dismiss stage is appropriate.[16]

    With respect to Revance, there is no plausible allegation that it was prepared to enter into a business relationship with Truinject at the time of the alleged negative comments.  Truinject did not make a pitch presentation to Revance until May 2018, a year after the alleged negative comments.  (SAC ¶ 237.)  Moreover, there are no other non-conclusory allegations concerning a potential business relationship between Truinject and Revance except for the pitch presentation, and I conclude that mere allegations of a pitch presentation are insufficient to plausibly allege a *bona fide* expectation of a business relationship, at least in this context.[17]

    The cases cited by Truinject are inapposite.  Those cases stand for the proposition that a complaint passes muster when it alleges facts showing that the plaintiff had a reasonable probability of a business relationship with a specific company.  But they do not stand for the proposition that it is enough to set forth the name of a particular company accompanied by a conclusory allegation that the plaintiff had a reasonable expectation of a deal with that company.[18] This is not a case where a business expectancy was reasonable based on a prior relationship between the plaintiff and a third party.  Rather, the SAC alleges that Truinject was a startup company seeking to do its first deal with a pharmaceutical company.

    Accordingly, I conclude that the SAC fails to plausibly allege the existence of a valid business expectancy.  For that reason alone, the claim should be dismissed.

    However, I also agree with Defendants that the SAC fails to plausibly allege that the Galderma Defendants engaged in intentional interference that induced or caused a termination of an expectancy.  According to Truinject, the Galderma Defendants intentionally interfered with its expectancies by making negative comments and statements about Rios, Truinject, and their product.

---

[16] *See, e.g.*, *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, No. CV 15-108-RGA, 2020 WL 4584354, at *5 (D. Del. Aug. 10, 2020); *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, No. 16-194-GMS, 2016 WL 11697058, at *1 n.1 (D. Del. Sept. 7, 2016); *Sustainable Energy Generation Grp., LLC v. Photon Energy Projects B.V.*, No. 8524-VCP, 2014 WL 2433096, at *15 (Del. Ch. May 30, 2014).

[17] *See, e.g., supra* n.16.

[18] *See supra* n.15.

(SAC ¶ 575.)  Defendants point out, however, and Truinject does not dispute, that most of the negative statements alleged in the SAC were made by Defendants' employees to other of Defendants' employees and/or Defendants' own physician consultants.  Truinject alleges that some of Defendants' physician consultants also consulted for Allergan, Merz, and Revance, but there is no suggestion in the SAC that any of those advisory physicians had any role in the other companies' business decisions regarding a potential deal with Truinject.  Frankly, I don't even understand the relevance of Truinject's allegation that, during Truinject's May 2018 pitch to Revance, a Revance employee who used to work for Galderma repeatedly said that the technology did not work and the patents were weak. (SAC ¶ 237.)

Conspicuously absent from the SAC is any allegation that any of Defendants' employees made negative comments to any employee of Allergan, Merz, or Revance.   Under these circumstances, I cannot conclude that the SAC plausibly alleges that Defendants made the comments with the intent to interfere with Truinject's expectancies to do deals with Allergan, Merz, and Revance.

To conclude, the allegations are insufficient to demonstrate improper, intentional interference with prospective business relations.  Because I conclude that Count VIII should be dismissed for the reasons discussed, I don't reach Defendants' other arguments.

Defendants also move to dismiss Count XVI, which alleges that "Defendants' actions constitute trade dress infringement, unlawful passing off, breach of contract, and unfair competition, and as a result they constitute an unlawful business practice in violation of Cal. Bus. & Prof. Code § 17200." (SAC ¶ 668.)  Truinject also contends that Defendants violated the Physician Payments Sunshine Act, constituting an unlawful business practice in violation of § 17200.

[Section 17200] defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice."[19]

Defendants argue that the unfair competition claims are preempted to the extent that they are grounded in the same facts as

---

[19] Cal. Bus. & Prof. Code § 17200.

the trade secret misappropriation claim.  I agree.  See, for example, the *Waymo* and *NetApp* cases cited in Defendants' brief.[20]

Truinject nevertheless argues that its § 17200 claim survives because that claim is also based on the following conduct by Defendants: (i) alleged commercial disparagement of Truinject (ii) alleged breaches of contract (iii) alleged violation of the Physician Payments Sunshine Act and (iv) alleged "passing off."

"Because section 17200 is written in the disjunctive, a business practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to violate the UCL."[21]  Section 17200's "coverage is 'sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.'"[22]  "By proscribing 'any unlawful' business practice, Section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."[23]

Truinject has certainly described some behavior that would fit under the category of unfair and/or unlawful that is not duplicative of its trade secrets claim, for example Defendants' alleged trade dress infringement.  And, indeed, Defendants acknowledged during the hearing today that a § 17200 claim can be based on trade dress infringement, which is also alleged in the SAC.[24]  So I will let this claim move forward.

Because I'm recommending denying the motion to dismiss this count, I don't think it's necessary to analyze the other asserted

---

[20] *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1063 (N.D. Cal. 2017); *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHKHRL, 2015 WL 400251, at *19 (N.D. Cal. Jan. 29, 2015).

[21] *Spring Design, Inc. v. Barnesandnoble.com, LLC*, No. C 09-05185 JW, 2010 WL 5422556, at *9 (N.D. Cal. Dec. 27, 2010).

[22] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999) (quoting *Rubin v. Green*, 847 P.2d 1044, 1052 (Cal. 1993)).

[23] *Id.* (internal marks and citation omitted).

[24] Accordingly, this case is not like *Alta Devices*, cited by Defendants, where disregarding the allegations concerning trade secret misappropriation left behind insufficient allegations to form an independent basis for a § 17200 claim.  *See Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 888 (N.D. Cal. 2018).

14

bases for the count that Defendants challenge, but I'll address some of them briefly.  As to the breach of contract argument, I don't think even Defendants dispute that a breach of contract claim can sometimes form the basis of an unfair competition claim under § 17200.  Although the Ninth Circuit has acknowledged that "a common law violation such as breach of contract is insufficient" to state a claim under the "unlawful" prong of the unfair competition statute,[25] California state courts have recognized that a "breach of contract may . . . form the predicate for Section 17200 claims, provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent.'"[26]  Courts have also held that the UCL may provide alternative remedies to a plaintiff.[27]

However, to the extent that Truinject's theory ultimately rests on the same facts as its trade secret claim, they may be preempted.  If after discovery it turns out that Truinject's only basis for the § 17200 claim is grounded in the same facts as its trade secrets claim, Defendants may re-raise the preemption argument at summary judgment.

As to the Physician Payments Sunshine Act argument, I have no idea what Truinject is going for here.  Truinject's answering brief contends that Defendants failed to disclose to the government that they gave a free Holly to a particular physician.  Truinject argues that the failure to disclose that transaction violated the Physician Payments Sunshine Act. But the SAC does not actually allege that Truinject failed to report that particular transaction.  Nor has Truinject persuasively explained how Defendants' alleged violation of a government reporting law caused Truinject to lose sales and harmed its business reputation.  The SAC does not state a § 17200 claim under this theory.

---

[25] *See Kulberg v. Washington Mut. Bank*, No. 10-CV-1214 W (BLM), 2012 WL 13175872, at *5 (S.D. Cal. Mar. 14, 2012) (quoting *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010)).

[26] *See, e.g., Puentes v. Wells Fargo Home Mortg., Inc.*, 72 Cal. Rptr. 3d 903, 909 (Cal. Ct. App. 2008) (emphasis in original) (quoting *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.* 178 F.Supp.2d 1099, 1117, fn. 12 (C.D. Cal. 2001)); *see also Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) ("[A] plaintiff may bring a UCL claim even where it overlaps with a concurrently brought breach of contract and breach of the implied covenant of good faith and fair dealing claim.")

[27] *See, e.g., Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, No. 2:17-CV-01515-KJM-AC, 2020 WL 3893395, at *4 (E.D. Cal. July 10, 2020).

As to the "passing off" allegation, the SAC has not alleged passing off.  Passing off occurs when a producer misrepresents his own goods or services as someone else's.[28] . . . . "'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own."[29] Passing off and reverse passing off refer to the good itself, not the idea behind it.

There is no allegation that Defendants ever took Truinject's injection training platform, that is Kate itself, and passed it off to consumers as its own Holly product. If Truinject is arguing that Defendants copied its invention, that's a patent infringement claim not a passing off claim.  If what Truinject is really pressing is a § 17200 claim based on its trade dress claim, as stated above, such a claim may move forward.[30]

For the reasons stated, I recommend that the Court deny Defendants' motion to dismiss Count XVI because Truinject has stated at least one plausible theory in support of a violation of § 17200.  However, I reject Truinject's other theories to the extent that they rely on trade secret misappropriation, violation of the Physician Payments Sunshine Act, and passing off.

Finally, Defendants ask for Count VIII to be dismissed with prejudice; however, I'm not convinced on this record that amendment would necessarily be futile so I recommend giving Truinject one last chance to try to plead a tortious interference claim.[31] That concludes my R&R.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C),

Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any

objections to the Report and Recommendation shall be filed within fourteen days and limited to

---

[28] *Bank of the West v. Superior Court*, 833 P.2d 545, 551 (Cal. 1992); *cf. OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1016 (9th Cir. 2018) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003)).

[29] *OTR Wheel*, 897 F.3d at 1016 (quoting *Dastar*, 539 U.S. at 27 n.1).

[30] *See Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. 15-0246 DOC, 2016 WL 6138416, at *7 (C.D. Cal. May 6, 2016) ("Because the Court finds Plaintiffs state a valid trade dress infringement claim, the [§ 17200] UCL claim also stands.").

[31] *See Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004) (holding that leave to amend should be granted "unless a curative amendment would be inequitable, futile, or untimely").

ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

       The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated: August 28, 2020

                                   _____
                                   The Honorable Jennifer L. Hall
                                   United States Magistrate Judge