## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRUINJECT CORP,

                      Plaintiff,

           v.

GALDERMA S.A.,
et al.,

                    Defendants.

C. A. No. 19-00592-GBW

**UNSEALED ON 10/6/23**

---

## MEMORANDUM ORDER

Plaintiff Truinject, Corp. ("Truinject") filed suit against Defendants Galderma, S.A., Galderma Laboratories, L.P., and Nestle Skin Health, Inc. (collectively "Defendants,") alleging breach of contract, trade dress infringement, trade secret misappropriation, and infringement of United States Patent Nos. 9,792,836 (the "'836 patent"), and 10,290,232 (the "'232 patent").[1]

Pending before the Court are Defendants' motions for summary judgement on damages, D.I. 595, trade secret misappropriation, D.I. 598, non-infringement of the '836 patent, D.I. 603, trade dress infringement, D.I. 607, and non-infringement of the '232 patent, D.I. 612.[2]  For the reasons explained below, the Court grants each motion.

---

[1] The Court writes for the benefit of the parties and assumes their familiarity with this action.
[2] The Court ordered the parties to rank the grounds for summary judgment raised in their motions with the understanding that "[i]f the Court decides to deny a motion filed by the party, barring

## I.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citation omitted). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* (citation omitted). The Court must enter summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [the non-moving] party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322). The Federal Circuit "reviews a district court's grant of summary judgment under the law of the regional circuit, here the Third Circuit." *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1075 (Fed. Cir. 2021) (citation omitted).

---

exceptional reasons determined *sua sponte* by the Court, the Court will not review any lower ranked summary judgment motions filed by the party." D.I. 587 at 5. Defendants ranked their motions accordingly: damages, D.I. 595, trade secret misappropriation, D.I. 598, non-infringement of the '836 patent, D.I. 603, trade dress infringement, D.I. 607, and non-infringement of the '232 patent, D.I. 612.

## II.    DISCUSSION

### A.    Defendants' Motion for Partial Summary Judgment of No Damages is Granted

Defendants move for partial summary judgment of no damages on four grounds.  D.I. 596 at 1-2.  Among the four grounds, Defendants assert that Truinject's damages theory has no causal link to any alleged breach of contract.  *Id*. at 6.  The Court grants Defendants' motion.

Truinject and Defendants entered into an Exclusive Negotiation Agreement and multiple Confidential Disclosure Agreements (collectively, the "Agreements") in late 2014 with respect to Truinject's product, "Kate."  A021-A024.[3]  Among other provisions, the Agreements contained a ninety (90) day exclusivity period, a nine (9) month noncompete period, and a three (3) year confidentiality period.  *Id*.  Prior to entering into the Agreements with Defendants, Truinject was in the process of a similar negotiation with Allergan, a non-party to the litigation.  A028.  Truinject stopped negotiating with Allergan in November 2014 because of the Agreements.  A034.  Truinject contends Allergan was prepared to offer Truinject $100 million for Kate, based on the testimony of Mr. Philippe Schaison.  A029.  At the time, Mr. Schaison was the Corporate Vice President of Allergan.  A356.

Truinject alleges Defendants breached the Agreements by making improper disclosures on December 15, 2014, June 11, 2015, and December 11, 2015.  A080.  The first disclosure occurred during the ninety (90) day exclusive negotiation period, the second during the nine (9) month noncompete period, and the third during the three (3) year confidentiality period.  A021-A024.

---

[3] References to the Appendix in Support of Defendants' Motions for Partial Summary Judgment and *Daubert* Motions shall be in the form of A[pg#].  References to the Statements of Fact in support of a particular motion shall be in the form of [#]SOF at [].

Truinject further alleges that Defendants misappropriated Truinject's trade secrets, infringed on Truinject's patents, and infringed on Truinject's trade dress by creating a competing product, "Holly," using information disclosed by Truinject in negotiations with Defendants. *See* D.I. 204.

Truinject first contends it could have reached a deal with Allergan in November 2014 but for Defendants' breach of contract. D.I. 667; A047-A048 ("It is further my understanding that if not for Truinject's agreement with Galderma, Allergan ... would have not only met with Truinject . . . but would have likely come to an agreement at that time for Allergan to acquire the rights to Truinject's technology."). Truinject argues it would not have entered into the Agreements had it known Defendants would breach. A290(51:12-16) ("[h]ad Truinject known that Galderma was going to breach, meet with those three parties, share the confidential information, among other things, they would never have signed the contracts with Galderma"). If Truinject had not entered the Agreements, Truinject contends it would have entered a deal with Allergan. *Id.* Alternatively, Truinject argues it could have entered a deal with Allergan after the end of the ninety (90) day exclusivity period but for Defendants' breach. D.I. 667 at 6. Truinject contends Defendants' breach stopped Truinject and Allergan from reaching a deal after the end of the exclusivity period because the breach devalued Kate's ability to provide Allergan a "competitive advantage" based on a "novel training module." *Id.*

Defendants assert that summary judgment is warranted because Truinject's alleged harm, the loss of the November 2014 deal with Allergan, arose prior to Defendants' alleged breach of contract. D.I. 596 at 6-10. For the following reasons, the Court grants Defendants' motion.

### i. Truinject's failure to reach a deal with Allergan in November 2014 was not caused by Defendants' alleged breach of contract.

Contract damages are intended to put the non-breaching party in the position it would have occupied but for the breach. *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678 at *44 (Del. Ch. Sept. 30, 2013). Accordingly, the Court considers how the positions of parties would differ in the hypothetical world that would exist if the contract had been fully performed. *Id.* Moreover, Truinject alleges consequential damages. Damages are consequential when the breaching party's actions cause the non-breaching party to suffer a loss of profit on a collateral business arrangement. *Frank Invs. Ranson, LLC v. Ranson Gateway, LLC*, No. CV 11101-VCN, 2016 WL 769996, at *13 (Del. Ch. Feb. 26, 2016). Consequential damages are recoverable only if the damages were a reasonably foreseeable probable result of the breach at the time the contract was entered. *Id.*

Under Truinject's damage theory, the parties' positions did not change because of Defendants' breach. *See* D.I. 667 at 4-9. Thus, the theory fails. Whether Defendants fully performed under the Agreements is irrelevant under Truinject's theory. Truinject contends it suffered harm because it forwent a deal with Allergan. However, even in the hypothetical world where Defendants fully performed, Truinject still forewent that deal. Truinject lost the opportunity to negotiate a deal with Allergan when Truinject signed the Agreements, not when Defendants allegedly breached. Truinject contends it would have reached a deal in November 2014 but for the Agreements. A047-A048. However, Truinject does not allege that a breach of contract occurred until the first disclosure in December 2014. A080. Because the alleged breach of contract occurred after the harm Truinject alleges, Defendants' breach of contract cannot be the but-for cause of Truinject's injury. *See AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F.

Supp. 2d 1319, 1330, 1344-45 (S.D. Fla. 2006) (granting JMOL against a damages theory "hampered by a temporal problem" because the lost "window of opportunity" "preceded [defendant's] interference ... by several months").

Truinject further contends it suffered harm because Defendants violated their duty to negotiate in good faith by disclosing Truinject's information to third parties and developing a competing product. D.I. 667 at 5-6. This argument fails for similar reasons. Assuming Defendants breached their obligation to negotiate in good faith, Truinject still asserts its injury occurred prior to Defendants' breach. *Id.* Truinject may have suffered a separate harm from the breach of good faith—for example, the costs of negotiation—but Truinject did not allege that harm in its expert report or its briefing. *See id.* at 6. Accordingly, Defendants' breach cannot be the but-for cause of Truinject's failure to reach a deal with Allergan.

Moreover, in the hypothetical world where Defendants fully performed, Truinject's position would not change. Truinject does not allege it would have reached a deal with Defendants. Thus, even if Defendants negotiated in good faith with Truinject, Truinject would still have foregone the deal with Allergan and would not have obtained a deal with Defendants.

### ii. Truinject's failure to reach a deal with Allergan after the Exclusivity Period was not caused by Defendants' breach.

Next, Truinject argues that it could have reached a deal with Allergan after the end of the Agreements' ninety (90) day exclusivity period but for Defendants' breach of contract. D.I. 667 at 6. Truinject contends that, had it known of the breach, Truinject could have resumed negotiations with Allergan. *Id.* at 7. Truinject claims it and Allergan could still have reached a deal but were unable to do so because Defendants' breach devalued Kate. *Id.* This argument fails

6

because Truinject has made no showing that Defendants' breach made it less likely that Allergan and Truinject could have reached a deal.

Truinject relies on the testimony of Mr. Schaison, then the Corporate Vice President of Allergan. A356. Mr. Schaison testified he was concerned that Defendants used information revealed by Truinject during its negotiations with Defendants to make a competing product. A406(140:7-140:15). Even after the end of the exclusive negotiation agreement, Mr. Schaison testified a deal with Truinject would be difficult because he would need to "refocus his team," "refocus himself," and find out what "machinations Galderma was up to." *Id*. But, Mr. Schaison did not testify that this concern arose from Defendants' breach of contract. Nor did he testify that his concern arose from facts resulting from the breach. Instead, Mr. Schaison's concerns about Defendant's conduct were based on Mr. Schaison's past experiences with Defendants. *E.g.*, A423(207:7-207:8) ("Galderma had a reputation to steal or copy other people technologies…"); A423(208:14-208:16) ("[T]hey got caught with their hands in the cookie jar while I was at Allergan. I knew they were going to do to something similar to Truinject.").

Moreover, Mr. Schaison's concerns were not based on Defendants' alleged breach because Mr. Schaison was not aware of the breach in the timeframe where Truinject and Allergan could have resumed negotiations. Mr. Schaison testified he had no firsthand knowledge of the dealings between Defendants and Truinject, no communication with any of Defendants' employees involved in the production of Holly, and no communication with any of the parties to whom Defendants disclosed. A398(109:2-110:12). Mr. Schaison further testified that, for the deal with Truinject to go through he would need to know Defendants' "game plan." A456(340:3). Similarly, Truinject presented no evidence that anyone at Allergan was aware of Defendants' disclosures.

A292(60:16– 61:16) (testimony from Ms. Holt that she was unaware of Allergan having any knowledge of Defendants' disclosures); A299(86:16-86:22) (same).

Therefore, even if Defendants had fully performed, the evidence suggests Mr. Schaison would have been just as suspicious because Defendants' conduct under the Agreements was not the basis for Mr. Schaison' suspicion. Similarly, because no one else at Allergan was aware of the alleged disclosures, those disclosures could not have caused Allergan to devalue Truinject's product. Accordingly, no reasonable jury could find that Defendants' breach of contract harmed Truinject's ability to enter into a deal with Allergan after the end of the exclusive negotiation period.

Because Truinject has not alleged harm arising from a breach of contract, the Court grants Defendants' motion for partial summary judgment of no damages.

### B.    Defendants' Motion for Partial Summary Judgment of No Trade Secret Misappropriation is Granted

Defendants move for partial summary judgment of no trade secret misappropriation on the grounds that Truinject has failed to proffer any evidence of misappropriation and has merely shown motive and opportunity. Defendants contend this is legally insufficient. In response, Truinject argues Defendants had ample motive and opportunity to misappropriate the trade secrets. For the reasons set forth below, the Court grants Defendants' motion.

### i.    Truinject Has Not Offered Any Evidence of Misappropriation.

Federal courts "analyze parallel state and federal claims of trade secret misappropriation together." *Agrofresh Inc. v. Essentiv LLC*, No. CV 16-662 (MN), 2020 WL 7024867, at *3 n.7 (D. Del. Nov. 30, 2020). Mere "motive and opportunity" that defendants "could have" misappropriated trade secrets is insufficient to prove misappropriation under Delaware law.

8

*Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 725 (Del. 2018). Similarly, merely pointing to similarities between parties' products is insufficient to survive summary judgment, especially when the similarities are in the public domain. *See Savor, Inc. v. FMR Corp.*, No. 00C-10-149JRS, 2004 WL 1965869, at *8 (Del Super. Ct. July 15, 2004) ("comparison of [] published components of the [plaintiff's trade secret] with similar components of the later-developed [accused product] cannot, without more, give rise to a reasonable inference of misappropriation."); *Callaway Golf Co. v. Dunlop Slazenger Grp. Ams., Inc.*, 318 F. Supp. 2d. 205, 214-15 (D. Del. 2004) (granting summary judgment on misappropriation where asserted similarities were "well known in the public domain"). Instead, a plaintiff must offer evidence that "(1) a trade secret exists; (2) the plaintiff communicated the secret to defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *Elenza*, 183 A.2d at 721. "[W]e are now at the summary judgment stage. It is no longer time for just smoke. There has to be some fire." *Id.* at 723-24.

Truinject proffers evidence of the second *Elenza* factor, i.e. that Truinject disclosed the trade secrets to Defendants. *See* D.I. 668 at 3 ("Dr. Pugh and Mr. Solomon cite numerous documents and testimony exhibiting *Truinject's* disclosure of lessons . . .) (emphasis added). However, Truinject proffers no evidence of the fourth factor, i.e. that Defendants improperly used or disclosed those trade secrets in a manner that injured Truinject. In fact, the closest Truinject comes to proffering this evidence is chiding Defendants' failure to establish an ethical wall and allowing individuals who received information from Truinject to work on Defendants' competing product. *Id.* at 4.

*Elenza* makes clear that this is insufficient. The plaintiff in *Elenza* alleged that the defendant had misappropriated trade secrets because engineers who collaborated with the plaintiff later worked on defendant's technology. *Elenza*, 183 A.3d at 723. The Delaware Supreme Court affirmed summary judgment on misappropriation because plaintiff's evidence was "insufficient to give rise to an inference of misappropriation because [it] could only establish that [defendant] 'could have' used [plaintiff]'s designs. It could not point to any evidence . . . that it actually did." *Id.* at 725-26. Evidence of a lack of ethical wall is only evidence of opportunity, not actual misappropriation, as conceded by Truinject's own expert. A2325(¶34) ("I am not opining that the lack of an ethical wall constitutes prima facie evidence of misappropriation; rather, my opinion is that the lack of an ethical wall made it possible for misappropriation to occur.").

Truinject's expert, Dr. Pugh, also failed to point to a single piece of evidence of misappropriation.

> Q. Do you have any proof, Dr. Pugh, that Mr. Rogers, or anyone else at Galderma, breached the confidentiality agreement and provided confidential information or trade secrets to the Chamberlain Group? [A]: I have already stated my opinion multiple times, and I have clarified in laborious detail to your multiple questions around the same topic. And it is my opinion that Galderma put themselves in a very difficult, unethical situation by not establishing an ethical wall. … That makes Galderma look very bad that they did not prevent the employees who had access to that information from interacting with the Chamberlain group who's developing a competitor product.
>
> Q: Setting aside your opinion that Galderma should have established an ethical wall – I want you to set that aside because I understand that opinion. Can you point me or the jury or the Court to any evidence you intend to rely upon in offering any opinion that Truinject's confidential information or trade secrets were actually shared with anyone at the Chamberlain Group? [A]: As I've previously stated, I relied on numerous documents and information regarding the relationship between Truinject and Galderma to write and state my opinion and reiterate it to you multiple times that Galderma put their credibility at risk by allowing their employees to even engage with a company that was developing a competing product.

A1489(261:3-23);    A1490(264:15-265:7);    A1488-1489(256:15-258:2),    A1494(279:2-19).

Truinject's other expert, Mr. Solomon, "did not opine as to the specific acts that constituted alleged misappropriation" but "[i]nstead, [] assumed the allegations of misuse by Truinject to be true." A2324(¶32).    Thus, Truinject has failed to come forward with any evidence of actual misappropriation of trade secrets by Defendants.

### ii.    Truinject Also Cannot Show Misappropriation Through a Combination of Public Information.

Truinject next argues that it possesses trade secrets in Kate.  Specifically, Truinject argues that, even if all the features of Kate were publicly known, Truinject nonetheless possesses trade secrets in Kate because "[t]rade secrets 'can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" D.I. 668 at 5 (quoting *Imperial Chem. Indus. Ltd. V. Nat'l Distillers & Chem. Corp.,* 342 F.2d 737, 742 (2d Cir. 1965)).  However, this argument does not support Truinject's contention that Defendants misappropriated any such trade secret.  A combination of public elements can be a trade secret only when the combination is itself "unique" and a "secret." *Imperial Chem.*, 342 F.2d at 742.  Truinject provided no evidence that its alleged combination of secrets is not apparent from a cursory review of its publicly available information.  The sole example of information hidden from public view that Truinject cites is Defendants' contractor's decision to partner with BioDigital.  D.I. 668 at 4.  However, BioDigital's capabilities are not Truinject's trade secret— they were publicly available on its website and Defendants' independent contractor already knew

BioDigital before meeting with Defendants. A1312-13(266:24-271:24); A1079(59:5-60:3); 2SOF at p. 4 ¶ 21 (not disputed); D.I. 600 at ¶ 21; A1363; 2RSOF at ¶ 11.

Given Truinject has failed to provide any evidence of actual misappropriation, the Court grants Defendants' motion for partial summary judgment of no trade secret misappropriation.

**C.    Defendants' Motion for Partial Summary Judgment of Non-Infringement of the '836 patent is granted because Holly's tracking system is not reasonably capable of tracking a needle inserted into a clear layer of elastomer.**

Claim 1 of the '836 patent recites an injection training apparatus containing, *inter alia*, "a clear layer of elastomer" and a "three-dimensional tracking system" that is "configured to determine a location of a needle inserted into the clear layer of elastomer." '836 patent at claim 1.

Truinject alleges that Holly infringes on the '836 patent because Holly is "fully capable of tracking a needle inserted into the clear layer." A2673. Truinject contends that, if a needle is placed within this plastic cover, Holly's tracking system is capable of tracking the needle's location. *Id.* Defendants argue Holly does not infringe because there is no evidence that a needle can be inserted into this plastic layer. D.I. 604 at 3-4. For the reasons set forth below, Defendants' motion is granted.

The parties dispute whether a product that infringes claim 1 of the '836 patent must include a needle that is inserted into the clear layer of elastomer during routine operation. Defendants argue that the claim requires that the tracking system track a needle which is actually inserted. *Id.* Truinject argues that a tracking system which merely possesses the capability to track an inserted needle is sufficient, regardless of whether the needle is ever actually inserted. D.I. 673 at 4. The Court finds actual insertion is necessary for infringement because the claim language is drawn to actual operation. '836 patent at claim 1. But, the Court finds that Holly does not infringe the '836

12

patent under either parties' construction of claim 1 because Holly's tracking system is not capable of configuration such that it can track a needle inserted into Holly's clear layer.

Sometimes, a device infringes merely because it is capable of operating according to a claimed limitation. *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4[th] 1361, 1372 (Fed. Cir. 2022). Other times, a device does not infringe unless it actually operates as claimed. The Court considers the claim language to determine whether capability or actual operation is required for infringement. *Id.* at 1371.

Here, the Court finds that claim 1 of the '836 patent is drawn to actual operation rather than capability. Claim 1 requires a "three dimensional [] tracking system...*configured to*...determine a location of a needle inserted into the clear layer of the elastomer." '836 patent at claim 1 (emphasis added). The claim is drawn to actual operation because it is not sufficient for the tracking system to be merely capable of tracking a needle inserted into the clear layer of the elastomer. Instead, the tracking system must be placed in a configuration that allows the tracking system to determine the location of an inserted needle.

Holly's tracking system does not track the location of an inserted needle. In fact, Dr. Dwight Meglan testified that that the syringe needle used on Holly cannot penetrate Holly's clear layer because the needle is not sufficiently strong. A1415-A1416(129:4-130-19). Further, Dr. Blake Hannaford, Truinject's technical expert, testified that he did not test the ability of the needle to penetrate the clear layer. *Id.*; A1211(67:25-68:3). Dr. Hannaford also testified that, because he did not test whether the needle could penetrate the cover, he had "no formal opinion" but did not "think so." A1203(35:23-35:24).

13

Truinject now asserts that Dr. Hannaford will testify at trial that Holly's needle can penetrate the clear layer. D.I. 673 at 5. However, Truinject presented no evidence that Dr. Hannaford will testify as such. Truinject points to four statements which it contends raise a genuine issue of material fact:

> "If, however, the syringe were inserted into the clear layer, the tracking system positioned inside the base would be able to determine the location of the needle."

> "I know [the Holly system can detect a needle inserted into the clear layer] because the Holly system used a tracker to track the location of the syringe body and plunger, and during any kind of injection, regardless of penetrating or not penetrating, the body and plunger do not go through that layer. And so it's capable of tracking the location of – in 3D of the needle – of the body and plunger, regardless of where the needle is. It uses the position of the needle relative to the body to do that."

> "It can meet it if a needle is inserted into the clear layer, and I'm not sure it requires the needle to be inserted. It's just capable of tracking a needle that might be inserted into the clear layer."

> "Yes, I feel like, my opinion is that if the need is inserted into a clear layer, Holly can completely track it as built."

> A2672; A1209; A1210; A1211.

At best, these statements only support that Holly could track a needle inserted into the plastic layer if a needle can, in fact, be inserted into the layer. Importantly, Dr. Hannaford never testified that a needle actually can be inserted into Holly's cover. *See, e.g.*, A2672; A1209; A1210; A1211. Rather, Dr. Hannaford assumes that a needle can be inserted and uses that assumption to assess other characteristics of Holly. *See, e.g.*, A2672; A1209; A1210; A1211.

Importantly, the Court reaches the same result even if mere capability to track an inserted needle is sufficient for infringement. The tracking system can only be "configured" to determine the location of the needle if the system is "capable" of tracking the needle. To determine whether a device is reasonably capable, the Court considers whether the device can perform the claimed

functions without significant alterations. *INVT SPE*, 46 F.4th at 1376. Courts have found capability claims infringed when the evidence showed: "some device users" performing a claimed function "some of the time," *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1216 (Fed. Cir. 2014), customers performing a claimed function which they were expected to perform, *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013) and devices necessarily producing a claimed function. *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1360 (Fed. Cir. 2018). Conversely, courts have rejected finding infringement based on a product being merely capable of modification in an infringing matter. *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117-1118 (Fed. Cir. 2002).

Holly is not "reasonably capable" of determining the location of a needle inserted into the clear layer of the elastomer. Truinject has failed to show that it is possible to insert a needle into Holly's clear plastic layer. Moreover, there is no evidence that inserting a needle into the clear plastic of Holly is an expected function, and there is no evidence that device users would ever insert a needle into Holly's clear plastic.

Given Holly's tracking system does not, and cannot, track a needle inserted into a clear layer of the elastomer, Holly does not infringe claim 1 of the '836 patent. Accordingly, Defendants' motion for partial summary judgement of non-infringement of the '836 patent is granted.

### D.    Defendants' Motion for Partial Summary Judgment on Trade Dress is Granted

Defendants move for partial summary judgment of no trade dress infringement, arguing that Truinject has not demonstrated secondary meaning. The Court grants Defendants' motion upon finding that the evidence presented by Truinject does not raise a genuine issue of material

fact because it is legally insufficient. *See Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 236 (3d Cir. 2017) (affirming a grant of summary judgment despite some factors weighing for the trademark owner where there was "almost no direct-to-consumer advertising, [the trademark owner] had a miniscule market share, and [] there was practically no record of actual confusion.").

To establish trade dress infringement for product design, a plaintiff must show its design acquired secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-12 (2000); *Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 485 (D.N.J. 2003). Secondary meaning exists when "in the minds of the public, the primary significance of [its trade dress] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc.*, 529 U.S. at 211. Further, "[j]urors [should not] have to make a leap of faith to conclude that the term gained secondary meaning because the record fails to provide meaningful support." *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 198-99 (3d Cir. 2008). To assess secondary meaning, the Third Circuit employs eleven (11) "non-exclusive" factors. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) ("A non-exclusive list of factors which may be considered includes: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion").

Truinject has not provided any evidence of a consumer survey. Also, it is undisputed that Truinject never sold Kate. 4SOF at ¶¶ 23-25. Therefore, factor 5 (consumer surveys) and factor 9 (sales) favor Defendants. D.I. 664 at 3. Also, Truinject has not identified any case where a

company with no sales and no consumer survey survived a motion for summary judgment.[4] While a survey is not required, "plaintiff's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96 CIV. 9469 (RWS), 1999 WL 191527, at *12 (S.D.N.Y. Apr. 7, 1999).

Moreover, several of Truinject's arguments on other factors support Defendants' case. For instance, Truinject argues that Defendants prevented Kate from acquiring secondary meaning (Factors 2, 3, 8, 9 and 10). D.I. 664 at 2. However, this suggests a lack of secondary meaning, not the presence thereof. Similarly, Truinject argues that Kate and Holly would have shared trade channels and would have been marketed to the same end users. *Id.* at 4. However, this is probative of likelihood of confusion, not secondary meaning. In fact, the presence of similar products, in the same channels of trade, with similar end users in fact militates against a finding of secondary meaning as consumers would not associate Kate's design with any individual company. *Commerce*, 214 F.3d at 440.

Further, Truinject's evidence of copying is insufficient as a matter of law. Truinject argues a "jury could find Defendants intended to copy Kate." D.I. 664 at 3. However, "the relevant intent is not just the intent to copy, but to pass off one's goods as those of another." *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 505-06 (D.N.J. 2014). Truinject has provided no evidence of copying done to pass off Defendants' goods as Truinject's, copying of trade dress instead of functional elements, or copying at all. *See* D.I. 664. Also, Truinject has presented no evidence

---

[4] The only case Truinject proffered with no sales by the plaintiff is *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. 2006). But there, GM provided surveys showing that between 77 and 96% of respondents could identify the challenged trade dress. *Id.* at 418.

that Kate possessed secondary meaning in the eyes of the public that Defendants could copy. *See id.*

Significantly, Truinject's evidence of "actual confusion" (factor 11[5]) relies on the statements of six people. A2221-A2232. However, these statements fail to show actual confusion because "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 674 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) (holding that "inquiries by [] industry professionals" on whether the defendant "copied" or "collaborated" with the plaintiff are not evidence of actual confusion, especially where the "purportedly confused persons had a pre-established personal or business relationship" with one of the parties).

First, Lisa Otis, an employee of Allergan, stated "I just went to true injects [sic] website and saw the same head. I thought they may have partnered with them." A2223. But, this is not evidence of actual confusion—Otis had a pre-established relationship with Truinject, knew the two products were different, and speculated about a collaboration. *Id.*

Second, Elizabeth Bentley, a marketing director at Galderma, testified that the competing products "looked just like" each other, that she was "blown away" the first time she saw Truinject's product, and that she thought "they had done a deal." A2224. An employee of Defendants (not a

---

[5] Truinject in its briefing refers to actual confusion as factor 12. D.I. 64 at 3. There are 11 factors. *Commerce*, 214 F.3d at 348.

consumer) who thought Defendants may have knocked off Kate is not evidence of actual confusion in the marketplace. *LVL XIII Brands*, 209 F.Supp.3d at 672.

Third, Dr. Heidi Waldorf saw Holly at a conference and texted "hmmmmm I have a problem w this… you know galderma took this from Truinject." A2226. Evidence that consumers could tell the products were different, even if it was a knockoff, is not evidence of actual confusion, but merely a visual similarity. Truinject's expert conceded as much. *Id.* ("[I]t is clear that Dr. Waldorf understood that Holly belonged to Galderma given that Holly was on display at the Galderma Booth.").

Fourth, the testimony of Stuart Raetzmann, the former CEO of Nestle Skin Health S.A., faces the same problem. Raetzmann was the CEO of a competitor, not a consumer. A2228. He never testified to being confused, only that the products looked similar—testifying he had "only seen Kate for a very brief period of time…almost a year earlier" and thus lacked the right basis to make a comparison. A2227. Thus, this is not evidence of actual confusion.

Fifth, Marco Valle, the former sales manager for Galderma, similarly testified that Defendants' product might have been a "knockoff." A2228. Valle, however, had a pre-existing relationship with a party, was not a consumer, and was aware the two products were different. Thus, this is not evidence of actual confusion. *LVL XIII Brands*, 209 F.Supp.3d at 672.

Sixth, Zain Bhojani, a "co-Director for an aesthetics injectable distributor" emailed Truinject asking to speak about Holly. A2230. This was, in fact, some evidence of actual confusion. However, this is the sole instance of confusion to which Truinject cites, there is no

evidence that this confusion led to a purchasing decision[6], and there is no evidence that Mr. Bhojani was a typical consumer. Thus, this evidence alone is insufficient as a matter of law because no reasonable jury could find actual confusion or secondary meaning based on this evidence alone. *See Parks*, 863 F.3d at 236 (affirming a finding of summary judgment despite three instances of actual confusion because such "paucity of proof of actual confusion suggests that the [] mark lacks secondary meaning.").

With respect to advertising and use in trade journals (factors 1 and 7), Truinject points to forty (40) Instagram posts, seven (7) advertisements in trade journals, and targeted visits to potential consumers. D.I. 664 at 2. As an initial matter, the Court notes that only a fraction of the Instagram posts and journal articles actually include the trade dress. A3549-53.[7] The Court also notes that Truinject has provided no evidence as to the content of the sales meetings.

The Third Circuit has found lack of secondary meaning even where the plaintiff had substantial sales and advertising over many years. *E.T. Browne*, 538 F.3d at 198-202. Truinject's evidence of a few social media posts and *de minimis* advertising is simply insufficient to raise a genuine issue of material fact. *Id.* at 199 (affirming a finding of summary judgment despite significant advertising, because "[a]lthough the evidence leaves no doubt that [trademark owner] hoped the [mark] would acquire secondary meaning, nothing shows that it achieved this goal. Jurors would have to make a leap of faith."). No reasonable jury could find that Truinject has presented sufficient evidence of secondary meaning in the marketplace. *Id.*

---

[6] Indeed, this is a case of reverse confusion that would have benefitted Truinject.

[7] The Court also notes that this exhibit appears to have been misuploaded in the appendix. The Court was able to review the posts in the redacted appendix.

Given Truinject's lack of sufficient evidence to show secondary meaning through the eleven (11) *Commerce* factors, the Court grants Defendants' motion for partial summary judgment of no trade dress infringement.

### E.    Defendants' Motion for Partial Summary Judgment of Noninfringement of the '232 Patent is Granted.

Defendants move for partial summary judgment of non-infringement of the '232 patent. For the reasons stated below, Defendants' motion is granted.

The '232 patent issued on May 14, 2019. '232 patent. Thus, for Defendants to infringe, Defendants must have made, used, sold, or offered to sell Holly within the United States after May 14, 2019. 35 U.S.C. § 271(a). Defendants argue there is no such evidence. D.I. 612 at 1. Truinject points to social media posts by Dr. Sebastian Cotofana suggesting Holly was used in the United States in connection with demonstrations of Holly abroad, and a contract Defendants entered with the High Lantern Group to market and advertise Holly. D.I. 670 at 1.

The evidence proffered by Truinject is insufficient. *Cf. Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, 612 F. Supp. 3d 408, 419 (D. Del. 2020). In *Acceleration Bay*, the court granted summary judgment of non-infringement after finding the plaintiff did not present sufficient evidence of infringement during the damages window. *Id.* The parties in *Acceleration Bay* were rival video game producers and the plaintiff argued the defendant infringed by testing the defendant's own game. *Id.* at 412. However, the plaintiffs conceded that the defendant's testing would only infringe if certain game modes were tested with a certain number of participants. *Id.* at 417. The plaintiff provided no direct evidence of testing. *Id.* Instead, the plaintiff pointed to game updates released by the defendant, defendant's admission that the game was tested, and a news article from an anonymous tester about how testers devoted "tons of time" to testing

21

"granular parts" of the game. *Id.* The court found this evidence insufficient because it would require the jury to speculate about the defendant's internal game-testing procedures to conclude that infringement occurred. *Id.* at 418.

In this case, as evidence of infringement, Truinject first points to social media posts made by Dr. Sebastian Cotofana. D.I. 670 at 1. Dr. Cotofana posted on Instagram May 28, 2019. D.I. 670, Ex.1. In the post, Dr. Cotofana stated, *inter alia*, "after my meeting in Verona I traveled to NYC [] to another outstanding event with #GALDERMA." *Id.* The post also contained an image of Dr. Cotofana standing behind Holly while another individual, mostly off-screen, appears to be injecting into Holly. *Id.*

The post by Dr. Cotofana fails to create a genuine issue of material fact for several reasons. First, the post is inadmissible hearsay. A party can rely upon hearsay statements on a motion for summary judgment only if the statements are capable of admission of trial. *Safas Corp. v. Etura Premier, L.L.C.*, 293 F. Supp. 2d 442, 446 (D. Del. 2003). Truinject seeks to use the post to prove the truth of out-of-court statements contained therein: specifically, that Dr. Cotofana "traveled to NYC" for another event with Defendants. Truinject does not allege that Dr. Cotofana was an employee of Defendants when the post was made. Thus, he is not a party opponent. Because no exception to the rule against hearsay applies, the statement is inadmissible. Fed. R. Evid. 402. Second, even if the statement were admissible, the statement still fails to raise a genuine dispute of material fact about whether Defendants used Holly in an infringing manner after May 14, 2019. Although the post was made on May 29, 2019, the picture could have been taken at any time. Considering the post was made only fifteen (15) days after the window for infringement opened, there is not sufficient evidence to conclude the picture was taken after May 14, 2019. Moreover,

it is unclear where the picture was taken because there are no indicia of location either in or attached to the image or post.

Third, Truinject points to circumstantial evidence suggesting Holly was used in the United States in connection with demonstrations of Holly abroad. D.I. 670 at 2. The record contains evidence that Holly was tested in Europe in the U.K. in 2019. *Id.* Truinject claims Dr. Hannaford would testify at trial that the industry practice when demonstrating novel technology includes testing and configuring the technology prior to demonstration. A2675 ("[I]t would be unreasonable to demonstrate an injection simulator, in a location requiring foreign or domestic travel, without technical inspection, or testing the system by operating it before transporting the simulator and traveling to demonstrate the simulator."). Also, Lisa Chamberlain (a vendor hired by Defendants to develop Holly) would testify she received a request for support in connection with Holly demonstrations in Europe in 2019. A1351(67:10-67:17). However, this alleged testimony does not create a genuine issue of material fact for the jury for several reasons.

First, Truinject admitted "[t]here is no document or testimony showing that TCG (or Defendants) actually set up or tested any Holly device in the United States after May 14, 2019." D.I. 672 at 17 (internal citations omitted). Second, Dr. Hannaford testified he had no knowledge "of any time after May 14, 2019, that anyone tested and used a Holly device in the United States in order to get ready to perform a demonstration of Holly overseas." A1218-1219(98:19-99:3). Third, Dr. Hannaford acknowledged that Holly devices were already present in foreign countries where demonstrations occurred, and that individuals demonstrating Holly could have used those devices. *Id.* at 98:10-98:16.

To find infringement, a jury would need to conclude that, when Defendants demonstrated Holly overseas, Defendants first tested a Holly device in the U.S after May 14, 2019. 35 U.S.C. § 271(a). Dr. Hannaford's testimony that not testing would be "unreasonable" is not evidence that testing actually occurred. Moreover, Truinject presents no evidence that any testing actually took place in the United States after May 14, 2019. Instead, Truinject asks the Court, and the jury, to speculate as to Defendants' internal testing procedures. Speculation is not sufficient to create a triable issue. *Acceleration Bay*, 612 F. Supp. 3d at 418.

Lastly, Truinject points to a "Statement of Work" Defendants executed with the High Lantern Group in August 2019. D.I. 670 at 3. Truinject contends this agreement creates a question of fact regarding whether High Lantern Group would have used Holly to fulfill its contract or whether Defendants were using Holly to promote its business. A2551-2553. This argument fails because the contract does not describe any actual use of Holly. *See id.* Instead, when asked about the agreement, Dr. Hannaford testified he had no "specific evidence" that "creating this agreement actually resulted in a use of Holly in the United States." A1216(88:7-88:10). In any event, the opportunity to infringe is not actual infringement. 35 U.S.C. § 271(a). Thus, whether a business "would have" used Holly to fulfill a contract is irrelevant as to infringement.

For all of these reasons, Truinject has failed to provide sufficient evidence to raise a genuine issue of material fact that Defendants made, used, sold, or offered to sell Holly after May 14, 2019. Accordingly, Defendants' motion for partial summary judgment of non-infringement of the '232 patent is granted.

## III.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions for partial summary judgment.

\* \* \*

WHEREFORE, at Wilmington this 26th day of September, 2023, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Partial Summary Judgment No.1 on Damages is **GRANTED**.

2. Defendants' Motion for Partial Summary Judgment No.2 on Trade Secret Misappropriation is **GRANTED**.

3. Defendants' Motion for Partial Summary Judgment No.3 on Non-Infringement of the '836 patent is **GRANTED**.

4. Defendants' Motion for Partial Summary Judgment No.4 on Trade Dress is **GRANTED**.

5. Defendants' Motion for Partial Summary Judgment No.5 on Non-Infringement of the '232 patent is **GRANTED**.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE